**RECORD NO. 14-7092**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
## For The District of Columbia Circuit

# ALBERT J. ADAMS,

*Plaintiff – Appellant,*

**v.**

# DISTRICT OF COLUMBIA,

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————

## CORRECTED PAGE PROOF BRIEF OF APPELLANT

————————

Michael J. Snider
James L. Fuchs
SNIDER & ASSOCIATES, LLC
600 Reisterstown Road, Seventh Floor
Baltimore, Maryland 21208
(410) 653-9060

*Counsel for Appellant*

THE LEX GROUP[DC] ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

---

### ALBERT ADAMS,

**Appellant,**

**v.**

### DISTRICT OF COLUMBIA,

**Appellee.**

### No. 14-7092

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Appellant Albert Adams Certify as follows:

A. Parties, Intervenors, and Amici Curiae.

The parties are Appellant, Albert Adams, and Appellee, District of Columbia.

B. Rulings Under Review.

The ruling under review is the June 27, 2014 order of the District Court for the District of Columbia (J. Boasberg) in Civil Action No. 02-0259, granting Appellee's Motion for Summary Judgment. Also under review is the September 28, 2010 order of the District Court dismissing Appellant's claim under the District of Columbia's Human Rights Act. Although Appellant appealed the District Court's Order, at that time, this Court held, on September, 1, 2011, in D.C. Circuit Case No. 11-7069, that "Appellant has not

1

demonstrated that the challenged order meets the stringent requirements of the collateral

order doctrine."   This Court did not rule, with respect to this dismissal, on the merits.


_____/s/_____

                                        James L. Fuchs, Bar #17092

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... viii

GLOSSARY ......................................................................................... xii

JURISDICTIONAL STATEMENT ......................................................... 1

ISSUES ON APPEAL ............................................................................. 2

    STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................... 2

STATUTES ............................................................................................ 5

STATEMENT OF THE CASE ................................................................. 5

    STATEMENT OF THE FACTS .............................................................. 8

        APPELLEE'S EEO OFFICE HAS DETERMINED THAT MR.
        ADAMS, A STROKE VICTIM, IS A QUALIFIED
        INDIVIDUAL WITH A DISABILITY ................................................ 8

        IN THE ONLY CONTEMPORANEOUS MEDICAL
        ASSESSMENT OFFERED IN THIS CASE, MR. ADAMS'
        PHYSICIAN DETERMINED THAT MR. ADAMS WAS
        ABLE TO WORK AND PERFORM THE ESSENTIAL
        FUNCTIONS OF HIS POSITION FROM HOME ............................ 9

        THE JOB REVIEW FOR MR. ADAMS—IN WHICH DR.
        DAVACHI ANSWERED YES FOR EVERY CATEGORY
        EXCEPT FOR ABILITY TO WORK IN AN OFFICE
        SETTING OR IN A SEDENTARY ENVIRONMENT, AND
        IN WHICH DR. DAVACHI CONFIRMED THAT MR.
        ADAMS COULD PERFORM HIS JOB OFFSITE—
        CORRESPONDS TO MR. ADAMS' POSITION
        DESCRIPTION ................................................................. 10

APPELLEE DENIED MR. ADAMS REASONABLE
ACCOMMODATION BECAUSE APPELLEE DID NOT
HAVE A TELEWORK POLICY IN PLACE, NOT BECAUSE
MR. ADAMS IS NOT A QUALIFIED INDIVIDUAL WITH A
DISABILITY....................................................................................11

APPELLEE DID NOT DENY THAT MR. ADAMS IS A
QUALIFIED INDIVIDUAL WITH A DISABILITY UNTIL
APPELLEE FILED APPELLEE'S ANSWER TO MR.
ADAMS' COMPLAINT IN THE FEDERAL DISTRICT
COURT ...........................................................................................12

THE DCOHR FOUND THAT THERE WAS PROBABLE
CAUSE TO CONCLUDE THAT APPELLEE HAD FAILED
TO ACCOMMODATE MR. ADAMS ...............................................12

MR. ADAMS TESTIFIED THAT, SUBSEQUENT TO HIS
STROKE, HE COULD PERFORM HIS DUTIES, AND
FOLLOW INSTRUCTIONS ...............................................................12

DR. DAVACI CONCLUDED, AND MR. ADAMS
TESTIFIED, THAT MR. ADAMS DID NOT NEED TO
TRAVEL TO PERFORM THE ESSENTIAL FUNCTIONS OF
HIS POSITION ................................................................................13

PRIOR TO MR. ADAMS' LAWSUIT AGAINST APPELLEE,
MR. ADAMS' SUPERVISOR DID NOT MAKE A GOOD
FAITH EFFORT TO ACCOMMODATE MR. ADAMS, OR
EVEN TO LEARN THE NATURE OF MR. ADAMS'
POSITION AND DUTIES .................................................................14

MR. STRASSMAN DID NOT GO THROUGH THE
MOTIONS OF ATTEMPTING TO ASSIST MR. ADAMS
UNTIL AFTER MR. ADAMS HAD FILED A COMPLAINT ........15

IF MR. ADAMS HAD RECEIVED REASONABLE
ACCOMMODATION, HE WOULD NOT HAVE APPLIED
FOR SOCIAL SECURITY, AND WOULD NOT HAVE
REPRESENTED THAT HE WAS NOT WORKING ......................16

DR. DAVACHI'S DIAGNOSIS OF MR. ADAMS, THE
ONLY CONTEMPORANEOUS DIAGNOSIS OF MR.
ADAMS, HAS NEVER BEEN CHALLENGED, EXCEPT BY
THE DISTRICT COURT, AS OPPOSED EVEN TO
APPELLEE ..................................................................................17

MR. ADAMS' MEDICAL NOTES DEMONSTRATE A
PATTERN OF PROGRESS THAT THE DISTRICT COURT
HAS NOT CHALLENGED AND CANNOT CHALLENGE ..........17

MR. ADAMS TESTIFIED THAT HE HAD BEEN
SUBJECTED TO A HOSTILE WORK ENVIRONMENT,
BECAUSE OF HARRASSING COMMUNICATIONS FROM
MR. STRASSMAN ......................................................................18

STANDARD OF REVIEW AND SUMMARY JUDGMENT ..............................18

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT & ANALYSIS ............................................................22

I.      This Court Has Criticized an Agency's *post facto* Decision that
        an Individual Is Not a Qualified Individual with a Disability
        under Circumstances Directly Comparable to Those of the
        Instant Case ........................................................................22

II.     Appellee Should Have Accommodated Mr. Adams, because (1)
        He Is a Qualified Individual ; (2) Appellee Has Failed to Show
        Undue Hardship; and (3) Appellee's Reasons for Denying Mr.
        Adams Reasonable Accommodation Are Specious and
        Inconsistent ........................................................................25

        A.      The Agency Has Failed to Demonstrate Undue Hardship ........25

                1.      Appellee Admits that Mr. Adams Has Met the
                        First Two Prongs Necessary to Establish a *Prima
                        Facie* Case for a Failure to Accommodate Claim ..........25

2.      Appellee's Reasons for Denying Mr. Adams
Reasonable Accommodation are Specious and
Inconsistent ................................................................. 25

3.      This Court, in *Langon*, Also Criticized the
Defendant for Taking a Carping and Inconsistent
Approach Similar to that which Has Been Taken
by Appellee Here ......................................................... 26

B.      Appellee Has Failed to Demonstrate Undue Hardship, in
that Appellee's Sole Reason for Denying
Accommodation Was Lack of a Telework Policy .................... 27

III.      There Is a Dispute of Fact Concerning Whether Mr. Adams
Could Have Performed the Essential Functions of His Position,
Had Appellee Provided Him with the Reasonable
Accommodation of Allowing Him to Telework ................................. 28

A.      The District Court Admits that an Employer Must
Generally Consider Telecommuting as a Potential Form
of Reasonable Accommodation ................................................ 28

B.      In *Langon*, when This Court Found a Dispute of Fact
concerning whether the Plaintiff in that Case Could Have
Performed the Essential Functions of Her Position with
Accommodation, This Court Relied upon Precisely the
Type of Evidence that Mr. Adams Has Provided Here:
(a) the Plaintiff's Own Perceptions; (b) the Opinion of
the Plaintiff's Physician; and (c) the Opinion of the EEO ....... 29

1.      In view of *Langon*, Mr. Adams' Perceptions about
His Ability to Perform His Job Constitute a
Disputed Issue of Fact ................................................... 29

2.      Summary Judgment Is Also Inappropriate in the
Instant Case, in that, as in *Langon*, Mr. Adams'
Physician Concurs with His Perceptions about His
Ability to Perform the Essential Functions of His
Position .......................................................................... 32

iv

3.    The EEO's Perceptions Concerning Mr. Adams'
      Ability to Perform His Position, as in *Langon*, Are
      Also a Factor to Be Taken into Consideration in
      Precluding Summary Judgment......................................37

4.    The District Court's Discussion of the DCOHR's
      Probable Cause Determination Is Hasty and
      Factually Incorrect ..........................................................38

5.    The District Court Has Accepted, Entirely
      Uncritically, Appellee's Limited Evidence ...................38

6.    None of Appellee's Managers Contend that Mr.
      Adams Could Not, if Accommodated, Perform the
      Essential Functions of His Position ...............................41

7.    Appellee Has Tacitly Conceded that Mr. Adams
      Could Perform the Essential Functions of His
      Position ...........................................................................42

8.    The District Court's Own Citation Supports Mr.
      Adams' Contention that whether He Could
      Perform the Essential Functions of His Position Is
      a Jury Question ..............................................................42

9.    The District Court Was Required to Consider,
      without Immediately, and Preemptorily
      Disregarding, Mr. Adams' Evidence.............................43

IV.   The District Court Has Inappropriately Decided All Factual
      Disputes in the Light Least Favorable to Mr. Adams........................44

      A.    Mr. Adams' Disability Application Is Consistent with
            His ADA Claims, in Law and in Fact .......................................44

B.    The District Court Improperly Concluded that Mr.
      Adams Could Perform None of the Essential Functions
      of His Position, Except Write Reports, Simply because
      His Supervisor, Who Did Not Know the Essential
      Functions of Mr. Adams' Position, Planned to Assign
      Him Reports ............................................................................47

C.    The District Court's Failure to Analyze Mr. Adams'
      Position Description, Except in Part, Undermines Its
      Factual Determination of what an IT Specialist Must Do ........48

D.    The District Court Drew Improper Conclusions from Its
      Selective Consideration of Mr. Adams' Deposition
      Testimony................................................................................50

E.    The District Court Has Misconstrued the Case Law, with
      Respect to Mr. Adams' Social Security Application................50

F.    Appellee Subjected Mr. Adams to a Hostile Work
      Environment ............................................................................54

G.    The D.C. Court Improperly Dismissed Mr. Adams'
      DCHRA Claims ......................................................................57

      1.    *Anderson v. U.S. Safe Deposit Company* Does Not
            Apply to the Instant Case, in which the DCOHR
            Had Found Probable Cause ...........................................57

      2.    The District Court's Holding that Mr. Adams Was
            Not Required to Exhaust His Administrative
            Remedies under Section 794 of the Rehabilitation
            Act Should Not be Applied Retroactively to Mr.
            Adams ..........................................................................59

CONCLUSION ........................................................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)............................................................................19

*Aka v. Washington Hospital Center*,
    156 F.3d 1284 (D.C. Cir. 1998)....................................................43

*Anderson v. Liberty Lobby*, *Inc.*,
    477 U.S. 242 (1986)............................................................................19

*Anderson v. U.S. Safe Deposit Company*,
    522 A.2d 859 (D.C. Ct. App. 1989) ........................................57, 58

*Badibanga v. Howard Univ. Hosp.*,
    679 F. Supp. 2d 99 (D.D.C. 2010)................................................55

*Basden v. Professional Transp. Inc.*,
    714 F.3d 1034 (7th Cir. 2013) ......................................................36

*Blake v. American College of Obstetricians & Gynecologists*,
    608 F. Supp. 1239 (D.D.C. 1985)................................................58

*Carter v. Bennet*,
    840 F.2d 63 (D.C. Cir. 1968)......................................................29

*Carter v. Tisch*,
    822 F.2d 465 (4th Cir. 1087) ......................................................51

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................19

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999)...................................... 40, 41, 45, 46, 47, 51

*Chief Authorities are Designated by an Asterisk.

*De Leon v. Secretary of Health & Human Services*,
　　734 F.2d 930 (2d Cir. 1984) ..........................................................................24

*Eccleston v. Secretary of the Navy*,
　　700 F. Supp. 67 (D.D.C. 1988)....................................................................24

*George v. Leavitt*,
　　407 F.3d 405 (D.C. Cir. 2005).........................................................19, 20, 56

*Gordon v. Dist. of Columbia*,
　　605 F. Supp. 2d 239 (D.D.C. 2009)..............................................................59

*Harris v. Forklift Systems, Inc.*,
　　510 U.S. 17 (1993)......................................................................................56

*Hogan v. Pierce*,
　　1983 U.S. Dist. Lexis 19615 (D.D.C. 1983) ...............................................24

*Holcomb v. Powell*,
　　433 F.3d 889 (D.C. Cir. 2006)....................................................................18

*Johnson v. Ry. Express Agency, Inc.*,
　　421 U.S. 454 (1975).....................................................................................60

*Johnson v. United States Capitol Police Bd.*,
　　2005 U.S. Dist. LEXIS 13811 (D.C.C. 2005) ..............................................24

*Jones v. Bernanke*,
　　557 F.3d 670 (D.C. Cir. 2009)....................................................................18

*Jones v. Management Partnership, Inc.*,
　　32 Fair Empl. Prac. Cas. (BNA) 639 (D.D.C. 1983)....................................58

*Jones v. Univ. of Dist. of Columbia*,
　　505 F. Supp. 2d 78 (D.D.C. 2007)..............................................................59

*Kuzmin v. Schweiker*,
　　714 F.2d 1233 (3d Cir. 1983), *superseded by statute*,
　　*as stated in Tustin v. Heckler*,
　　749 F.2d 1055 (3d Cir. 1984) .....................................................................24

*Langon v. HHS,*
    959 F.2d 1053 (D.C. Cir. 1992)..................................... 22, 23, 24, 25, 26, 27,
                                     29, 30, 32, 34, 37, 38, 43, 44

*Lucas v. W. W. Grainger, Inc.,*
    257 F.3d 1249 (11th Cir. 2001) ...............................................................51, 52

*Makovics v. Schweiker,*
    577 F. Supp. 1287 (D. Del. 1983) ..................................................................24

*Mastro v. Potomac Elec. Power Co.,*
    447 F.3d 843 (D.C. Cir. 2006)........................................................................18

*Opsteen v. Keller Structures, Inc.,*
    408 F.3d 390 (7th Cir. 2005) .........................................................................53

*Reeves v. Sanderson Plumbing Prods.,*
    530 U.S. 133 (2000)..................................................................................18, 19

*Salazar v. Wash. Metro. Area Transit Auth.,*
    401 F.3d 504 (D.C. Cir. 2005)........................................................................18

*Scott v. Johanns,*
    409 F.3d 466 (D.C. Cir. 2005)........................................................................38

*Solomon v. Vilsack,*
    628 F.3d 555 (D.C. Cir. 2010)........................................................................54

*Stewart v. Dist. of Columbia,*
    2006 WL 626921 (D.D.C. 2006) ...................................................................59

*Swanks v. Wash. Metro. Area Transit Auth.,*
    179 F.3d 929 (D.C. Cir. 1999)..................................................................42, 43

*Texas Dept. of Community Affairs v. Burdine,*
    450 U.S. 248 (1981)........................................................................................19

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997).......................................................................20

*Weaver v. Gross*,
   41 Empl. Prac. Dec. (CCH) 36 (D.D.C. 1986)................................................58

*Weigel v. Target Stores*,
   122 F.3d 461 (7th Cir. 1997) ...................................................................36, 37

*\*Whitbeck v. Vital Signs*,
   115 F.3d 588 (D.C. Cir. 1997)................................................................51, 52

## STATUTES

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

*29 U.S.C. § 701 *et seq.*...................................................................................1

29 U.S.C. § 794 .............................................................................4, 7, 22, 59

42 U.S.C. § 1201 *et seq.*............................................................................1, 6

D.C. Code § 2.1401.01 *et seq.* ................................................................1, 4, 6

## RULES

Fed. R. App. P. 3 ...............................................................................................1

Fed. R. Civ. P. 56(c)........................................................................................19

# **GLOSSARY**

| | |
|---|---|
| DCOHR | District of Columbia Office of Human Rights |
| ADA | Americans with Disabilities Act,<br>42 U.S.C. § 1201 *et seq.* |
| DCHRA | District of Columbia Human Rights Act,<br>D.C. Code § 2.1401.01 *et seq.* |

## <u>JURISDICTIONAL STATEMENT</u>

The district court had federal-question subject-matter jurisdiction under 28 U.S.C. § 1331 because Appellant's Complaint (R10) was brought under the Americans with Disability Act of 1990, 42 U.S.C. § 1201 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the D.C. Human Rights Act of 1977, D.C. Code Title 1, Chapter 25, D.C. Code § 2.1401.01 *et seq.* This Court has appellate jurisdiction over this appeal pursuant to Fed. R. App. P. 3 and 28 U.S.C. § 1291 because the district court entered an order and memorandum opinion granting Appellee's motion for summary judgment, which disposed of all Appellant's claims, on June 27, 2014, and, as such, was a final order. The Appellant filed a timely notice of appeal on July 30, 2014.

## ISSUES ON APPEAL

### STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Was the United States District Court for the District of Columbia correct in concluding that Appellant is not a qualified individual with a disability, based upon a *post-facto* justification five years after the fact, after Appellee had expressly concluded that Appellant is a qualified individual with a disability?

2.    Was the United States District Court for the District of Columbia correct in failing to take into account evidence concerning Appellee's express representation that a lack of policy concerning telework was the only reason that Appellee failed to provide Appellant with reasonable accommodation?

3.    Was the United States District Court for the District of Columbia correct in disregarding medical evidence concerning Appellee's ability to perform the essential functions of his position, when Appellee offered no contrary medical evidence?

4.    Was the United States District Court for the District of Columbia correct in disregarding an affidavit by Appellant's physician, concerning Appellant's ability to perform the essential functions of his position, when Appellee offered no contrary medical evidence?

2

5.    Was the United States District Court for the District of Columbia correct in concluding that Appellant is not a qualified individual with a disability, on the basis of a position description, when Appellee offered no witness asserting that Appellant cannot perform the essential functions of his position, when Appellant's supervisor testified that he did not know the essential functions of Appellant's position, and when Appellant's supervisor had testified that he was able to place Appellant in a position in which he did not dispute that Appellant would be performing the functions of his position?

6.    Was the United States Court for the District of Columbia correct in concluding that Appellant was incapable of performing the functions of his position, on the basis of a Social Security application, which Appellant had filed after Appellee had denied Appellant reasonable accommodation?

7.    Was the United States District Court for the District of Columbia correct in concluding, on summary judgment, that Appellee is not a qualified individual with a disability, on the basis of deposition testimony responding to leading questions, which is contradicted by Appellant's other deposition testimony, responsive to more open questions?

8.    Was the District Court for the District of Columbia correct in concluding that Appellant was not subjected to a hostile work environment, even though Appellant's supervisor had told Appellant that he did not know if he needed Appellant, and even though Appellant's supervisor telephoned Appellant's house and verbally abused Appellant's wife?

9.    Was the District Court for the District of Columbia correct in discounting a finding of Probable Cause by the District of Columbia Office of Human Rights ("DCOHR")

10.   Was the United States District Court for the District of Columbia correct in dismissing Appellant's DCOHR claim—on the purported basis that Appellant had not successfully withdrawn his DCHRA complaint—on the basis of a 20-year-old superior court case, in which the superior court had held that, had the DCOHR found Probable Cause (as the DCOHR had found in Appellant's case), the result might have been different?

11.   Was the United States District Court for the District of Columbia correct in retroactively applying to Appellant its conclusion that Appellant was not required to exhaust his administrative remedies under Section 794 of the Rehabilitation Act?

4

## STATUTES

Pertinent statutes are set forth in the addendum.

## STATEMENT OF THE CASE

Mr. Albert Adams, the Appellant, an employee of the District of Columbia's Department of Mental Health ("Appellee"), was deemed by Appellee's EEO Director to be a qualified individual with a disability R56, p.109, after Mr. Adams had suffered a stroke in 2005. Appellee's EEO Director, David Z. Prince, had consulted with Mr. Adams' physician, who had concluded that Mr. Adams, an IT specialist, could work at home. *Id.* at 108-9;R54-9, p.4. Mr. Prince thereby concluded that Mr. Adams is a qualified individual with a disability (R56, pp.108,117, and, to date, has not retracted this assessment.

Appellee nonetheless denied Mr. Adams' request to work from home as reasonable accommodation. Appellee's EEO office admitted that the *only* reason that Appellee denied Mr. Adams reasonable accommodation was that Appellee had no telework policy in place. R57, p.2. The District of Columbia Office of Human Rights ("DCOHR") subsequently found Probable Cause that Appellee had failed to provide Mr. Adams with reasonable accommodation. R57-1, p.16.

For five years, Appellee never denied that Mr. Adams is a qualified individual with a disability. Appellee committed an about-face concerning Mr. Adams' ability to work from home five years after the fact, and only after Mr.

Adams had filed a federal complaint.  Appellee's about-base is based on no

medical evidence, in addition to being contrary to the conclusions of Mr. Adams'

treating physician. R54-9, p.4.  Appellee's about-face is also contrary to the

testimony of Mr. Adams' supervisor, who never asserted that Mr. Adams was

incapable of performing the essential functions of his position.  Appellee's present

posture in this case is thus based upon a *post-facto* justification.

On February 22, 2006, Mr. Adams timely filed a complaint in the DCOHR.

R11-1.  On January 1, 2008, the DCOHR found **"PROBABLE CAUSE** to believe

that Defendant failed to provide Plaintiff reasonable accommodation, on the basis

of his disability (partial paralysis from a thalamus stroke), of telecommuting from

his home, in order to perform his job as an Information Technology Specialist."

R57-1, p.16.  On October 20, 2009, the DCOHR, in response to Mr. Adams'

motion to transfer, dismissed the case, so that Mr. Adams could file in the Federal

Court. R12-4, p.2.

Mr. Adams' Federal action was based upon the Americans with Disabilities

Act ("ADA"), the Rehabilitation Act of 1973, and the District of Columbia Human

Rights Act ("DCHRA").  In response to a motion to dismiss, the district court held

that Mr. Adams had not successfully withdrawn his DCHRA complaint, and was

thus barred from seeking a judicial remedy. R18, p.25.  The district court then

denied a motion for reconsideration.  R24.  Although Appellant appealed the

6

district court's Order, at that time R25, this Court held, on September, 1, 2011, in

D.C. Circuit Case No. 11-7069, that "Appellant has not demonstrated that the

challenged order meets the stringent requirements of the collateral order doctrine."

This Court did not rule, with respect to this dismissal, on the merits.

　　　The district court, with respect to the merits, erred by relying upon, and

misapplying,  a 20-year-old case in the District of Columbia superior court, which

held that, if the  DCOHR had found Probable Cause—as the DCOHR found in this

case—a different conclusion could arguably have been drawn.

　　　The district court also erred by applying retroactively to Appellant its

conclusion that Appellant was not required to exhaust his administrative remedies

under Section 794 of the Rehabilitation Act.

　　　Moreover, the district court, in granting summary judgment, ignored

Appellee's about-face, ignored the conclusions of Appellee's EEO office, brushed

aside the only medical evidence in this case provided, and determined that

Appellee's tacit admissions that Mr. Adams could work from home—by assigning

him reports and installing a computer in his home—admittedly during

negotiations—were simply an effort to go beyond the call of duty.

　　　The district court also, while claiming to have taken into account the District

of Columbia's Probable Cause determination: to wit, that Appellee had failed to

provide Mr. Adams with reasonable accommodation, failed to make any specific

7

reference to the contents of said determination.  The district court did not even know the date of the Probable Cause Determination, and cited an incorrect date.

The district court also brushed aside the hostile work environment engendered in post-complaint threats by Mr. Adams' supervisor  to Mr. Adams, in which the supervisor questioned whether Mr. Adams were still needed; as well as the hostility reflected in abusive calls to Mr. Adams' home.  Thus, the district court erred in granting summary judgment in Appellee's favor.

## STATEMENT OF THE FACTS

### APPELLEE'S EEO OFFICE HAS DETERMINED THAT MR. ADAMS, A STROKE VICTIM, IS A QUALIFIED INDIVIDUAL WITH A DISABILITY

David Z. Prince, who is Appellee's EEO manager, "provide[d] a memo in January of '06 concluding that I felt Mr. Adams was a qualified individual with a disability." R56, p.109.  Mr. Prince made this determination concerning Mr. Adams, after having met with Mr. Adams, after having made inquiries with Mr. Adams' physician, Khosrow Davachi, M.D., P.C., and after having spoken to Mr. Adams' manager. *Id.*, pp.108-9.  During his deposition, Mr. Prince reaffirmed that "my conclusion was that he [Mr Adams] was" a qualified person with a disability. *Id.*, p.117.  Mr. Prince testified that he had based his conclusions upon the medical documentation and Mr. Adams' physician's statements.  *Id.*  Mr. Prince also believes that he relied upon Mr. Adams' position description.  *Id.*

8

Mr. Prince testified that, as he had stated in his memorandum, *he believed that Mr. Adams could perform his job*, *irrespective of his accommodation*.  The "substance" of his memorandum, he explained, "was that "I concluded that he was a qualified individual with a disability and that—so qualified, meaning that *he could perform the essential functions of his job with or without accommodation.*" *Id.*,p.132 (emphasis added).

Mr. Prince also based his conclusion, to wit: that Mr. Adams was a qualified individual with a disability, "on discussion with Mr. Adams' supervisor, Eric Strassman, as to whether the functions Mr. Adams performed, could be performed from home."  *Id.*,pp.117-18.

### IN THE ONLY CONTEMPORANEOUS MEDICAL ASSESSMENT OFFERED IN THIS CASE, MR. ADAMS' PHYSICIAN DETERMINED THAT MR. ADAMS WAS ABLE TO WORK AND PERFORM THE ESSENTIAL FUNCTIONS OF HIS POSITION FROM HOME

In the only contemporaneous medical assessment offered in this case, Mr. Adams' physician, Dr. Davachi, noted that Mr. Adams "is still able to operate with his right hand, see the computer screen and see all that is required for the job." R54-9,p.4.  Dr. Davachi had therefore concluded, again, at the time of Mr. Adams' stroke, that "Mr. Adams is able to work from home."  *Id.*  Dr. Davachi reaffirmed this position, and commented specifically on the essential functions of Mr. Adams' position, little more than one year later, noting Mr. Adams' ability to work independently, and from home. R57-2, pp.2-3.  His only limitations, with respect

9

to job performance, were inability to work in an office setting, and in a sedentary environment. R57-3,p.2.  Mr. Adams could, however, accomplish his tasks from "an offsite location via alternative measures, such as telephone/email/video conference/fax." *Id.*  Dr. Davachi formed his conclusions after examining Mr. Adams, speaking to him, and reviewing his job description. R58-6,p.4.  Dr. Davaci's evaluation of Mr. Adams was continuing ; but, from the very time of Mr. Adams' stroke, Dr. Davachi concluded that Mr. Adams could perform the essential functions of his position.  Again, Appellee's EEO Office agreed.

## THE JOB REVIEW FOR MR. ADAMS—IN WHICH DR. DAVACHI ANSWERED YES FOR EVERY CATEGORY EXCEPT FOR ABILITY TO WORK IN AN OFFICE SETTING OR IN A SEDENTARY ENVIRONMENT, AND IN WHICH DR. DAVACHI CONFIRMED THAT MR. ADAMS COULD PERFORM HIS JOB OFFSITE—CORRESPONDS TO MR. ADAMS' POSITION DESCRIPTION

The Job review, in which Dr. Davachi concluded that Mr. Adams was able to complete all of the tasks, save for being able to accomplish the job in an office setting and a sedentary environment R57-3,pp.2-3, corresponds to Mr. Adams' position description.  *Inter alia*, the first paragraph of the Job review refers to "Completion of reports delineating problems, issues, scheduling and process of jobs and duties related to legacy systems Management Information Systems." *Id.* This correspondents to the first paragraph of Mr. Adams' position description, under "Major Duties," which states that the incumbent has "principal responsibility for all legacy systems," including "daily scheduling and processing of jobs,"

"completion of daily, monthly, and 'as needed' reports," and "reporting of system activity." R54-5.  Dr. Davachi checked off a "Y" for "Yes in all of these categories, and he did so throughout the "job review." R57-3, pp.2-3.

The "Job Review" also includes areas that Appellee now claims that Mr. Adams cannot perform, and that Dr. Davachi has made clear that Mr. Adams could and can perform:  including participation in Help Desk support; coordination and management of projects regarding the system; participation in meetings, conferences, and committees; technical knowledge; and ability to communicate both orally and in writing. *Id.*.  These functions are all included in Mr. Adams' position description. R54-5.  Although Dr. Davachi noted steady improvement, he made clear that, from the time of his initial examination of Mr. Adams after the stroke, he had concluded that Mr. Adams was capable of performing the essential functions of his position from home. R57-8.

## APPELLEE DENIED MR. ADAMS REASONABLE ACCOMMODATION BECAUSE APPELLEE DID NOT HAVE A TELEWORK POLICY IN PLACE, NOT BECAUSE MR. ADAMS IS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY

Appellee denied Mr. Adams reasonable accommodation, not—as Appellee now claims, because Mr. Adams is purportedly not a qualified individual with a disability—but because "*DMH does not currently have a policy on telecommuting and is unaware of any District Government policy regarding the subject.*" R57,p.2.

(emphasis in original).  Thus, Appellee "is unable to grant the accommodation you request." *Id.*

## APPELLEE DID NOT DENY THAT MR. ADAMS IS A QUALIFIED INDIVIDUAL WITH A DISABILITY UNTIL APPELLEE FILED APPELLEE'S ANSWER TO MR. ADAMS' COMPLAINT IN THE FEDERAL DISTRICT COURT

Appellee did not dispute Mr. Adams' status as a qualified individual with a disability until Appellee filed Appellee's answer in the federal case, on July 5, 2011. R27.  Nor has Appellee offered a medical opinion to dispute that of Dr. Davachi.

## THE DCOHR FOUND THAT THERE WAS REASON TO CONCLUDE THAT APPELLEE HAD FAILED TO ACCOMMODATE MR. ADAMS

Based upon Appellee's refusal to allow Mr.  Adams to work from home, Appellee's Office of Human Rights concluded that there is "Probable Cause" to believe that Defendant failed to provide Mr. Adams with reasonable accommodation. R57-1,p.16.

## MR. ADAMS TESTIFIED THAT, SUBSEQUENT TO HIS STROKE, HE COULD PERFORM HIS DUTIES, AND FOLLOW INSTRUCTIONS

Mr. Adams testified that his impairment never prevented him from performing the essential functions of his position, and that he had no difficulty following instructions. R54-4,pp.119-120.  He was not forgetful; and he explained that he could perform the essential functions of his position, because he knew the

programs.  *Id.*,p.123.  He was able, in August 2005, to type his reports, *id.*,pp.116-17, a proficiency he also demonstrated in Dr. Davachi's office. *Id.*, pp.136-7.

### DR. DAVACI CONCLUDED, AND MR. ADAMS TESTIFIED, THAT MR. ADAMS DID NOT NEED TO TRAVEL TO PERFORM THE ESSENTIAL FUNCTIONS OF HIS POSITION

Dr. Davaci, after reexamining Mr. Adams, reaffirmed that Mr. Adams' immobility would not impair his ability to perform the essential functions of his position, particularly via telephone conferencing, email or telephone calls.  R57-2.  Mr. Adams testified that he had previously performed all of his job functions from *one location*, 64 New York Avenue. R54-4, p.55.  In his help desk functions, Mr. Adams would speak to his customers remotely. *Id.*, p.64.  Although he had sometimes traveled to see clients, he had done so voluntarily, strictly on an *ad hoc* basis. *Id.*, p.58.

He dealt with computer systems "online," with multiple users, who were working from various locations. *Id.*, pp.69-70.  As long as Mr. Adams was working from his terminal, the location of the terminal itself did not matter; and could have been at Mr. Adams' house.  On a typical day, he would get to work, sit at his desk, log on to the systems and make certain that they had run all night and that everything had come out. *Id.*, p.86.  He would look at the daily reports on the screen and make certain that the information came out right.  *Id.*

13

Further, at the time that Mr. Adams requested reasonable accommodation, training was not part of his major duties as an IT specialist. *Id.*, p.172. Nonetheless, he was equipped to train, as Dr. Davachi pointed out. R57-3;R54-4, p.89.

Appellee appears to have conceded that any purported slurring in Mr. Adams' speech would not have prevented him from performing his job, because Mr. Adams' former supervisor planned to assign him reports.  To be sure, such a limited role for Mr. Adams was unnecessary, given that Mr. Adams had previously engaged in such tasks as developing, implementing, and coordinating activities designed to ensure, protect, and restore information technology systems and services. R54-4, p.176.  He had also monitored and evaluated system compliance, information technology, and security requirements, still other non-speaking tasks. At the help desk, he could communicate with customers by email, but could additionally converse and participate in meetings telephonically, as Dr. Davachi had diagnosed at the time. R54-9, p.4.

## PRIOR TO MR. ADAMS' LAWSUIT AGAINST APPELLEE, MR. ADAMS' SUPERVISOR DID NOT MAKE A GOOD FAITH EFFORT TO ACCOMMODATE MR. ADAMS, OR EVEN TO LEARN THE NATURE OF MR. ADAMS' POSITION AND DUTIES

Prior to Mr. Adams' lawsuit against Appellee, Mr. Adams' supervisor, Mr. Strassman, did not make a good faith effort to accommodate Mr. Adams, or even to learn the nature of his position, or his duties.  Prior to Mr. Prince's first meeting

14

with Mr. Strassman, well before Mr. Prince's letter to Mr. Adams—informing Mr. Adams that Appellee could not accommodate him—Mr. Strassman did "not really" know anything about Mr. Adams' position. R56, p.110.  Nor, prior to the meeting, did Mr. Strassman learn about Mr. Adams' functions, even though Mr. Prince had informed him about the purpose of the meeting. *Id.*, pp.112-113.  Significantly, Mr. Prince cannot recall any instance, other than with Mr. Strassman, in which a supervisor was unable to identify what the employee was doing. *Id.*.  Mr. Strassman also admitted, at his deposition, that he did not know what Mr. Adams' tasks were. R.60,pp.60,64.

## MR. STRASSMAN DID NOT GO THROUGH THE MOTIONS OF ATTEMPTING TO ASSIST MR. ADAMS UNTIL AFTER MR. ADAMS HAD FILED A COMPLAINT

Mr. Strassman did not assign Mr. Adams tasks until post-Complaint mediation.  Nor did he propose training to Mr. Adams until November 22, 2006 R58:  a date that is more than eight months after Mr. Prince had written Mr. Adams his exit memorandum denying reasonable accommodation R57; more than eight months after Mr. Adams had filed a formal Complaint (on February 15, 2006) R11-1; and more than 14 months after Mr. Adams had filed his informal Complaint. R58-1.  Mr. Strassman's proposal for training expressly refers to Mr. Adams' "lawyer." R58,p.2.

15

Although Mr. Adams had not been placed back on the Agency's payroll, he was ostensibly given a new supervisor, Sylvia Mackay. R60,p.78. Yet, Ms. Mackay never contacted Mr. Adams, and Mr. Adams does not even know who she is. R54-4,p.80. Mr. Strassman never followed up to see if she had contacted Mr. Adams. R60, p.79. Although Ms. Mackay never contacted Mr. Adams, Mr. Strassman cannot recall any mistakes that she made, with respect to Mr. Adams' case. *Id.*, pp. 101-2. Mr. Strassman did not feel impelled to go to HR, *id.*, p.113 or to do anything else. *Id.*, p.114. It did "[n]ot particularly" bother him that no attempt to accommodate Mr. Adams seemed to be transpiring. *Id.*, p.82. Nor had he even developed a "feeling" that Mr. Adams had not written reports until the time of his deposition, years later. *Id.*, p.104.

### IF MR. ADAMS HAD RECEIVED REASONABLE ACCOMMODATION, HE WOULD NOT HAVE APPLIED FOR SOCIAL SECURITY, AND WOULD NOT HAVE REPRESENTED THAT HE WAS NOT WORKING

Had Mr. Adams received reasonable accommodation, and been allowed to work from home, he would have done so; and thus would not have needed to apply for Social Security. R58-4,pp.4-5  As he testified at his deposition, "I simply wanted to work at home, and I couldn't do it. They wouldn't let me. I wanted to be able to work from home after my stroke." R54-4,p.50.

## DR. DAVACHI'S DIAGNOSIS OF MR. ADAMS, THE ONLY CONTEMPORANEOUS DIAGNOSIS OF MR. ADAMS, HAS NEVER BEEN CHALLENGED, EXCEPT BY THE DISTRICT COURT, AS OPPOSED EVEN TO APPELLEE

Appellee had the opportunity to have its own physician examine Mr. Adams and did not. In contrast, Dr. Davachi's evaluation was based upon a thorough investigation, in which, *inter alia*, Mr. Adams typed for Dr. Davachi. R58-6,p.4. Moreover, Appellee has never questioned Dr. Davachi's credentials nor provided any reason to believe that Dr. Davachi's evaluation of Mr. Adams was not comprehensive and careful. The usefulness and efficacy of Dr. Davachi's credentials and evaluations was challenged, for the first time, not by Appellee, but by the district court. R69,pp.16-17

## MR. ADAMS' MEDICAL NOTES DEMONSTRATE A PATTERN OF PROGRESS THAT THE DISTRICT COURT HAS NOT CHALLENGED AND CANNOT CHALLENGE

Mr. Adams' additional medical notes demonstrate a pattern of progress not only unchallenged by Appellee, but unchallenged as well by the district court. According to Mr. Adams' physical therapy notes, Mr. Adams had shown a constant pattern of progress. He had demonstrated "good progress" on November 15, 2014, R63,pp.62-63 and had continued to progress, on November 28, 2005, *id.*, p. 67;December 5, 2005, *id.*, p. 69; and January 9, 2006. *Id.*,p.83. These notes were within months of Mr. Adam's stroke. The district court makes no reference to them.

## MR. ADAMS TESTIFIED THAT HE HAD BEEN SUBJECTED TO A HOSTILE WORK ENVIRONMENT, BECAUSE OF HARRASSING COMMUNICATIONS FROM MR. STRASSMAN

Mr. Adams testified that he had been subjected to a hostile work environment, because Mr. Strassman, over the telephone, spoke abrasively to Mrs. Adams, and shouted at her. R54-4,pp.218-19; *see also* R58-5; told Mr. Adams that he would need to take public transportation R54-4,pp.219-220, notwithstanding the stroke; and questioned his need for Mr. Adams' position. *Id*, p. 229. Mr. Adams recognized that Mr. Strassman appeared to be trying to get rid of him. *Id.*, pp. 224-25.

## STANDARD OF REVIEW AND SUMMARY JUDGMENT

The Court of Appeals reviews the district court's grant of summary judgment *de novo* and may affirm only if, viewing the evidence in the light most favorable to the non-moving party and giving him the benefit of all permissible inferences, it concludes that no reasonable jury could reach a verdict in his favor. *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 849-850 (D.C. Cir. 2006 (*citing Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)); *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (holding that court should view the evidence in the light most favorable to the non-moving party).   Thus, summary judgment is appropriate only if the

pleadings, depositions, answers to interrogatories, admissions, and affidavits filed

pursuant to discovery show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ.

P. 56(c); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48; *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).

Appellee must proffer a legitimate nondiscriminatory reason for its actions

with sufficient specificity to allow Appellant to rebut it.  *Texas Dept. of*

*Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981).   Any competing

reasonable inferences and conclusions, based on the existing record, must be drawn

in favor of Mr. Adams.  *Reeves*, 530 U.S. 133 at 150.

The Supreme Court has also made clear that the judge's function is not to

determine the truth of any legal matter, *Anderson*, 477 U.S. at 249, but is, rather, to

"determine whether there is a genuine issue for trial."  *Id.*  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge" ruling on a

motion for summary judgment.  *Id.* at 255.  Thus, reviewing a motion for summary

judgment, a court must view all of the evidence in the light most favorable to the

nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *George*

*v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005) (citations omitted).

19

This Court must determine if Appellee's actions "have been arbitrary or capricious" or "consisten[t] with its own procedures" and its "applications of its governing law." *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997). In an employment discrimination case, "[u]sually, proffering evidence from which a jury could find that the employer's stated reasons were pretextual will be enough to get a plaintiff's claim to a jury." *Leavitt*, 407 F.3d at 413.

## <u>SUMMARY OF THE ARGUMENT</u>

The district court erred in granting Appellee's motion for summary judgment on Mr. Adams' claims under the ADA and the Rehabilitation Act and in dismissing his claims under the DCHRA. Appellee's entire case is based upon a counter-factual and *post facto* justification, which Appellee only asserted five years after the fact, and which is contradicted by Appellee's EEO manager as well as by Mr. Adams' physician, the only doctor who examined him at the time of the stroke and subsequent to it. Appellee never claimed that Mr. Adams was not qualified at the time, and never claimed this, until Appellee filed its answer in this case. Similarly, Appellee never asked its own physician to examine Mr. Adams.

Mr. Adams' supervisor testified that he planned to have Mr. Adams writing reports, because he had heard that Mr. Adams was good at writing reports. R.60,pp.63-64. Although Mr. Adams was capable of doing far more, the supervisor did not testify that Mr. Adams could not perform the essential functions

20

of his position.  Above all, the district court inexplicably and inappropriately failed to address altogether Appellee's about-face.

The district court also committed error in relying upon Mr. Adams' Social Security application, in that Mr. Adams did not apply for Social Security until after Appellee had failed to grant him reasonable accommodation.  His statements about inability to work were strictly within that context, and the law of this Court is that applications for Social Security, filed under these circumstances, should not be held against the employee, and that the employee should be given an opportunity to explain any apparent contradictions.  Mr. Adams' explanations here are consistent with those that this Court and other courts have accepted.

The district court also inappropriately discounted the DCOHR's finding of Probable Cause, which the district court, without evidence, characterized as "the legal conclusions of one District employee." R69,p.17.  Although the district court claimed that the DCOHR's determination was counterbalanced by a "mountain of primary materials and sworn testimony in this case" *id.*, (1) Appellee offered no medical evidence; (2) made no reference to Dr. Davaci's findings or the medical notes; (3) made no reference to Appellee's manager's deposition; (4) made no reference to Appellee's EEO's officer's deposition; and (5) made selective, and misleading, references to Mr. Adams' deposition.

The district court erroneously concluded that Appellant has not been subjected to a hostile work environment, even though Appellant's supervisor (1) told Appellant that he did not know if he needed him; (2) telephoned Appellant's house and verbally abused Appellant's wife; and (3) callously directed Appellant to take public transportation.

The district court also erred in dismissing Appellant's DCHRA claim, and holding that Appellant had not successfully withdrawn his DCHRA complaint—by relying upon, and misapplying, a 20-year-old superior court case, in which that court acknowledged that, with a Probable Cause Determination, as in the instant case, the result might have been different.    It was also error for the district court to apply retroactively its conclusion that Appellant was not required to exhaust his administrative remedies under Section 794 of the Rehabilitation Act.

## ARGUMENT & ANALYSIS

**I.**    **This Court Has Criticized an Agency's *post facto* Decision that an Individual Is Not a Qualified Individual with a Disability under Circumstances Directly Comparable to Those of the Instant Case**

This Court has criticized an Agency's *post facto* determination that an individual is not a qualified individual with a disability years after, as in the instant case, the Agency denied reasonable accommodation for strictly administrative reasons.  As this Court commented in *Langon v. HHS*, 959 F.2d 1053 (D.C. Cir. 1992):

. . . a few words are in order about HHS's shifting positions in this case and the confusion this has generated. It has been ten years since HHS—in its words at the time—"finally" refused to allow Ms. Langon to work at home. When her supervisor reached this decision in February 1982, the only reason given was that the accommodation would impose an undue hardship on the agency. In December 1983, HHS denied Ms. Langon's appeal on this ground but added another— that she was not a "qualified handicapped individual" within the meaning of 29 C.F.R. § 1613.702(f), which defines the phrase as a "handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual . . .." *Langon*, 959 F.2d at 1058.

As this Court noted, the defendant in *Langon*—similar to Appellee here— had "[i]n the district court, and on appeal . . . put forth an entirely different and, in some ways contradictory, rationale." *Id.*[1]  Appellee's shift, in the instant case, is comparable to that of the defendant in *Langon*.  In *Langon*, the defendant asserted that the individual was not a "qualified handicapped individual" years after denying reasonable accommodation, on the then grounds that such accommodation would purportedly impose an "undue hardship."  In the instant case, Appellee has

---

[1] To be sure, the contradictory rationales that the defendant in *Langon* took are somewhat different than in the instant case.  As this Court noted in *Langon*, the defendant had "deemed" the plaintiff "unqualified," based upon alleged health concerns.  Still, this Court criticized HHS for having "[i]n the district court, and on appeal. . . ha[ving] put forth an entirely different and, in some ways contradictory, rationale," and having asserted "a position entirely at odds with HHS's findings in 1983." *Langon*, 959 F.2d at 1058 (citations already provided).  Thus, this Court's decision in *Langon* stresses the inappropriateness of maintaining two separate positions, with respect to the same employee, at different junctures of litigation, and the inappropriateness of a *post facto* assertion that an individual is not a "qualified handicapped individual."

23

asserted that Mr. Adams is not a qualified individual with a disability five years after denying him reasonable accommodation solely on grounds that Appellee did not have a telework policy in place. The respective administrative bases upon which the defendant in *Langon* and Appellee here denied reasonable accommodation, in the first place, are also analogous.

Decisions by the District Court of the District of Columbia have echoed this Court's view that a party may not rely upon *post facto* justifications. *See Eccleston v. Secretary of the Navy*, 700 F. Supp. 67, 68 (D.D.C. 1988); *Johnson v. United States Capitol Police Bd.*, 2005 U.S. Dist. LEXIS 13811, *25 (D.C.C. 2005); *Hogan v. Pierce*, 1983 U.S. Dist. Lexis 19615, *44 (D.D.C. 1983). Other courts have agreed that an agency's "flip flop," in an administrative decision, places said decision in question. *Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir. 1983), *superseded by statute*, *as stated in Tustin v. Heckler*, 749 F.2d 1055 (3d Cir. 1984); *De Leon v. Secretary of Health & Human Services*, 734 F.2d 930, 937; *Makovics v. Schweiker*, 577 F. Supp. 1287, 1292 (D.Del.). The district court's failure to address entirely Appellee's reliance upon *post-facto* justification, that Mr. Adams is not a qualified individual, is thereby as inappropriate as it is inexplicable.

24

**II.**    **Appellee Should Have Accommodated Mr. Adams, because (1) He Is a Qualified Individual ; (2) Appellee Has Failed to Show Undue Hardship; and (3) Appellee's Reasons for Denying Mr. Adams Reasonable Accommodation Are Specious and Inconsistent**

**A.**    **The Agency Has Failed to Demonstrate Undue Hardship**

As this Court has held, an Agency should reasonably accommodate "a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship . . . " *Langon*, 959 F.2d at 1053. As will be discussed below, Appellee never stated that granting Mr. Adams telework would be difficult.

**1.**    **Appellee Admits that Mr. Adams Has Met the First Two Prongs Necessary to Establish a *Prima Facie* Case for a Failure to Accommodate Claim**

Appellee admits that Mr. Adams has met the first two prongs of a failure-to-accommodate claim: to wit, that Mr. Adams was disabled; and that Appellant was aware of Mr. Adams' disability. R54-1,p.6.

**2.**    **Appellee's Reasons for Denying Mr. Adams Reasonable Accommodation are Specious and Inconsistent**

Appellant's reasons for denying Mr. Adams are inconsistent, in view of Appellee's about-face five years after the fact. In endorsing Appellee's about-face, the district court has thereby taken a position directly contrary to that of this Court in *Langon*, which criticized an agency's "different" and "contradictory rationale."

25

### 3.    This Court, in *Langon*, Also Criticized the Defendant for Taking a Carping and Inconsistent Approach Similar to that which Has Been Taken by Appellee Here

This Court, in *Langon*, also criticized the defendant in that case for having taken a carping, as well as an inconsistent position.  Such tactics are comparable to Appellee's tactics here, in scrutinizing, and mischaracterizing, Mr. Adams' request for disability; and—again, in order to prove a counter-factual—relying upon selective portions of Mr. Adams' deposition testimony, almost nine years after his claim.

The portions of Mr. Adams' testimony upon which Appellee relies have, after all, been clarified by other portions of  his deposition testimony, which Appellee does not quote, but in which Mr. Adams provided fuller answers, and explained why he was able to perform the essential functions of his position. The district court similarly relied upon selective portions of Mr. Adams' deposition testimony.  That is, the district court both failed to weigh Appellant's direct answers to open questions, and, inexplicably privileged monosyllabic responses to leading questions.  Ultimately, the judgment on Mr. Adams' testimony involves a credibility determination, which the district court cannot make at the summary judgment stage.

With respect to the Application for Disability Insurance Benefits, Mr. Adams filed that application on September 14, 2005. R54-6,p.2.  This was one day

after the counseling interview, held on September 13, 2004, in which Appellee

informed Mr. Adams that Defendant would not be providing him with reasonable

accommodation. R57,p.2.   Had Mr. Adams been allowed to telework, he would

not have needed to apply for disability, and would not have applied. R58,4,pp.4-5.

Significantly, said application never states that Mr. Adams could not have

worked from home, had he been provided with the accommodation of telework.

R54-6.  Again, Mr. Adams only applied for disability insurance benefits, because

he was not allowed to work from home. R58-4, pp.4-5.  Appellee, by mean-

spiritedly attempting to use Mr. Adams' disability application to block his ADA

claim, has resorted to precisely the type of tactics that led this Court to conclude

about the plaintiff in *Langon*:  "One cannot escape the impression that Ms. Langon

is being whipsawed."  *Langon*, 959 F.2d at 1058.  The district court's endorsement

of said tactics is thus contrary to this Court's ruling in *Langon*.

### B.    Appellee Has Failed to Demonstrate Undue Hardship, in that Appellee's Sole Reason for Denying Accommodation Was Lack of a Telework Policy

Because Appellee's sole reason for which Appellee denied Mr. Adams the

reasonable accommodation of telework was that Appellee did not have a telework

policy in place R57, p.2, Appellee has failed to demonstrate undue hardship.  In

fact, as Appellee has admitted, Appellee eventually installed a computer at Mr.

Adam's house R60, p.84, albeit after litigation. R54-4, pp.140-41.   The plan to

have Mr. Adams write reports from home, though characterized by the district court as beyond the cause of duty R69,p.16, would not have onerous.  Nor is there any evidence that it would have been onerous to allow Mr. Adams to perform the other tasks, described on his position description, from home.  When initially denying Mr. Adams reasonable accommodation, Appellee never expressly claimed that adjusting the "no telework" policy to accommodate Mr. Adams would have constituted a hardship.

**III.    There Is a Dispute of Fact Concerning Whether Mr. Adams Could Have Performed the Essential Functions of His Position, Had Appellee Provided Him with the Reasonable Accommodation of Allowing Him to Telework**

**A.    The District Court Admits that an Employer Must Generally Consider Telecommuting as a Potential Form of Reasonable Accommodation**

The district court admits that "[i]t is true that an employer must generally consider telecommuting as a potential form of reasonable accommodation."  R69 p.8.  It is instructive that Appellee's EEO manager maintains, to this day, that Mr. Adams could have performed his job from home.  R57, pp.117 132.

28

**B.** **In *Langon*, when This Court Found a Dispute of Fact concerning whether the Plaintiff in that Case Could Have Performed the Essential Functions of Her Position with Accommodation, This Court Relied upon Precisely the Type of Evidence that Mr. Adams Has Provided Here:  (a) the Plaintiff's Own Perceptions; (b) the Opinion of the Plaintiff's Physician; and (c) the Opinion of the EEO**

This Court, in *Langon*, relied upon precisely the type of evidence that Mr. Adams has offered here in determining that there is a dispute of fact, precluding summary judgment, concerning whether the plaintiff in that case, with the accommodation she sought, could have performed the essential functions of her position: to wit, (a) the plaintiff's own perceptions; (b) the opinion of the plaintiff's physician; and (c) the opinion of the EEO.  This court prefaced its consideration of these three types of evidence by noting that the essential question is, whether, with the accommodation being sought, the plaintiff could have performed the position's essential functions.  If so, the burden shifts to the defendant to show that the accommodation being sought is not a reasonable one.  *Langon*, 959 F.2d at 1061 (*citing Carter v. Bennett*, 840 F.2d at 65-66).

**1.** **In view of *Langon*, Mr. Adams' Perceptions about His Ability to Perform His Job Constitute a Disputed Issue of Fact**

Mr. Adams' perceptions about his ability to perform the essential functions of his position create a dispute of fact.  In *Langon*, this Court first found that there

was a dispute of fact, precluding summary judgment, based upon the plaintiff's perceptions:

> On that score, there was a factual dispute precluding summary judgment. Ms. Langon was convinced that she could satisfactorily function as a computer programmer at home and she provided evidence to this effect based on her perceptions of her own condition and ability. *Id.*, 959 F.2d at 1061.

In the instant case, Mr. Adams, who, like the plaintiff in *Langon*, worked in computers, and who sought to work from home, *see id.*, testified, at his deposition, that he did not have difficulty following instructions R 54-4, pp. 119-120; he was not forgetful, *id.*, p.123; he was always able to express in words what he was thinking, *id.*; and he does not recall peoples' having to repeat things to him. *Id.*

He outlined his typical daily duties, which he could perform remotely from home. He dealt with computer systems "online," with multiple users, who were working from various locations. *Id.*, pp. 69-70. As long as Mr. Adams was working from his terminal, the location of the terminal itself did not matter; and could have been at Mr. Adams' house. *Id.*, pp. 73-74. On a typical day, he would sit at his desk, log on to the systems and make certain that they had run all night, and check daily reports and other information. *Id.*, p. 86. Despite his impairment, because of his knowledge of the systems, he could continue to analyze the programs and make certain that systems were running properly, tasks that were central to his responsibilities. *Id.*

As Mr. Adams explained at his deposition, he was able, in August 2005, to type these reports, because he had retained his ability to type in his right hand at that time. R54-9, p.4. He had also demonstrated to Dr. Davachi that he could type. R58-6, p.4. He was able to sit all day in performing his tasks. R54-4, p.109.

To be sure, Mr. Adams had testified, and his position description suggested, that his position involved travel once a week. However, Mr. Adams also testified that his travel had been "voluntary," and on an *ad hoc* basis," and that the training had ceased prior to the time that he had his stroke. *Id*.,pp.89, 172, 223-24.

The district court, while acknowledging this testimony, characterized it as "a snapshot of his duties at one point in nearly three years." R69 ,p.11. However, the camera flashed its shot at the precise time in issue, and Appellee provided no evidence from anyone in Appellee's management to suggest that travel was essential at this time or thereafter. Rather, if travel had been essential, Mr. Prince would not have stated that Mr. Adams was a qualified individual with a disability. Appellee's idea of having Mr. Adams write reports would likewise have been impractical, and pointless, had Mr. Adams not been able to perform the essential functions of his position, and had travel been essential to said functions.

31

2.    **Summary Judgment Is Also Inappropriate in the Instant Case, in that, as in *Langon*, Mr. Adams' Physician Concurs with His Perceptions about His Ability to Perform the Essential Functions of His Position**

This Court, in *Langon*, also viewed as significant evidence that the plaintiff's physician agreed with the plaintiff's perceptions.  As this Court stated: "Dr. Harrison shared her conviction.  He informed HHS that Ms. Langon's position as a computer programmer was 'excellent for her because of its sedentary and mentally stimulating nature.'"  *Langon*, 959 F.2d at 1061.

Similarly, in the instant case, Dr. Davachi concluded, in the aftermath of Mr. Adams' stroke, that Mr. Adams "is still able to operate with his right hand, see the computer screen and see all that is required for the job." R54-9, p.4.  Dr. Davachi had therefore concluded, again, at the time of Mr. Adams' stroke, that "Mr. Adams is able to work from home."  *Id.*  In contrast, Appellee has offered no countervailing medical evidence.

Dr. Davachi reaffirmed this position, and commented specifically on the essential functions of Mr. Adams' position, little more than one year later, in which Dr. Davachi concluded that Mr. Adams "receives general supervision and he plans, resolves and carries out his work independently.  He is able to accomplish this task." R57-2,p.2.  Dr. Davachi also noted that, with respect to Mr. Adams' major duties, Mr. Adams' participation in meetings "could be done via telephone

32

conferencing, email or telephone calls." *Id.* Dr. Davachi thereby concluded that Mr. Adams is able to work from home. *Id.*, p.3.

Dr. Davachi based his conclusions upon "hav[ing] reviewed and discussed the position description with Mr. Adams." *Id.*, p.2. He also noted that, little more than one year subsequent to the stroke, Mr. Adams had "greatly improved since the stroke." *Id.* Dr. Davachi therefore filled out a form, concerning Mr. Adams' responsibilities, in which he concluded that Mr. Adams was able to fulfill all the essential functions of his position, and was unable to do only two things: work in an office setting, and accomplish the job in a sedentary environment. R57-3.

The functions that Dr. Davachi concluded that Mr. Adams was able to perform, after examining him, speaking to him, and reviewing his job description, are, *inter alia*: (1) completing reports; (2) training; (3) coordinating with vendors; (4) monitoring hardware performance); (5) overseeing protective measures, such as systems backup; (6) providing Help Desk support; (7) coordinating projects; and (8) participating in meetings and conferences. *Id.* In fact, the only functions that Dr. Davichi concluded that Mr. Adams could not perform were: (1) ability to accomplish this job in a sedentary environment; and (2) ability to accomplish this job in an office setting. *Id.*

Although the district court discounted Dr. Davachi's diagnosis as "nothing more than generalities, R69, p.16, the district court fails to note that Appellee

provided no medical documentation whatsoever.  The district court also fails to explain why it believes that what it deems "generalities," unopposed by any countervailing medical documentation, are "unhelpful to Mr. Adams' case." *Id.* The district court does not distinguish Dr. Davachi's conclusions, in his 2005 letter, about Mr. Adams; ability to work from home, from the statement by the physician in *Langon*, that the plaintiff's position as a computer programmer was 'excellent for her because of its sedentary and mentally stimulating nature.'" *Langon*, 959 F.2d at 1061.

The district court, in its rush to discredit Dr. Davachi,  launches contradictory attacks upon him—attacks that Appellee did not make.  The district court incorrectly states that "Davachi did not make his opinion on Plaintiff's condition known . . . until more than a year after" Mr. Adams' request for accommodation. R69,p.16.  The district court then admits that Dr. Davachi submitted a letter "in October 2005, before the denial", *id.*, pp.16-17, and thus made his opinion known.

Further, Dr. Davachi, in his affidavit, explained that he had been continually monitoring Appellant, from 2005 onward, and that the monitoring began in 2005, the time of the stroke. R58-6,pp.2-3.  His affidavit was based upon his observations from the time of Mr. Adams' stroke.  His more specific discussion of Mr. Adams'

34

job functions was thus based upon his observations in 2005, and was not, contrary to the district court's suggestion, invented out of whole cloth in 2006.

The suggestion that Dr. Davachi did not make his opinion known in 2005 is also factually incorrect, in that Mr. Prince testified, as the district court fails to note, that, in determining that Mr. Adams is a qualified individual with a disability, he consulted with Dr. Davachi. R56, pp.108-9. Thus, even one of Appellee's representatives admits that Dr. Davachi had made his opinion known in 2005.

The district court incorrectly states that "[p]erhaps Adams means to suggest that his status has changed since the District made its decision in February 2006." R69, p.17. First, as the district court fails to note, Appellee's denial of reasonable accommodation in 2006 had nothing to do with Appellee's status, as Appellee cannot deny. Moreover, as Dr. Davachi stated in his affidavit, Mr. Adams was capable of working from home in 2005, but his condition continued to improve. R58-6,pp.3-5. His assessment that Mr. Adams could perform the essential functions of his position was, while more detailed in 2006, entirely consistent with his 2005 assessment, as he explained in his affidavit. *Id.*, pp.3-7.[2] His assessment is also consistent with the medical notes, which, as discussed above, note progress

_____

[2] The district court's efforts to distinguish Mr. Adams' condition in 2006 from his condition in 2005 are also contrived, in that Mr. Prince did not write his letter to Mr. Adams, in which Appellee denied Mr. Adams reasonable accommodation—again, on the basis that Appellee did not have a telework policy in place—until February 6, 2006 R57, as the district court acknowledges. R69, p.8.

throughout 2005 and 2006 R63, when Appellee issued its exit letter. The district court has not claimed that these notes are "mere generalities," given that the district court has failed to mention them altogether.

The district court cites *Basden v. Professional Transp. Inc.*, 714 F.3d 1034 (7th Cir. 2013) for the proposition that Appellee had determined, in 2006, that Mr. Adams was unable to perform the essential functions of his position, and that Appellee was not obligated to "revisit the issue," once Appellee had decided not to accommodate Mr. Adams. *Basden* is, in fact, inapposite, because, in *Basden*, the plaintiff had requested leave, and merely "hoped" that a specialist's diagnosis and the use of medication "would allow her to return to work." *Id.*, 714 F.3d at 1038. The plaintiff's termination in that case was thus based on the plaintiff's inability to guarantee that she could return to work, based upon her health condition.

In the instant case, unlike in *Basden*, Appellee's EEO office had determined that Mr. Adams could perform the essential functions of his position, and denied him reasonable accommodation because Appellee did not have a telework policy in place, not because Appellee, in 2006, questioned Mr. Adams' ability, with accommodation, to perform the essential functions of his position.[3]

---

[3] In *Basden*, the Seventh Circuit cited *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir. 1997), in which a statement by the plaintiff's *psychiatrist* that "there was a good *chance*" that she would be likely to be able to return to work with treatment was too conclusory and uninformative. *Basden*, 714 F.3d at 1038 (*citing Weigel* 122 F.3d at 468-69 (emphasis added)). *Weigel* is distinguishable, because (1) the

The district court's professed concern about "punishing employers for effectively postponing the effective date of denial" R69,p.17, also does not logically apply to a case in which, as here, the denial was not particularly delayed, and not based upon Mr. Adams' eligibility status.

### 3. The EEO's Perceptions Concerning Mr. Adams' Ability to Perform His Position, as in *Langon*, Are Also a Factor to Be Taken into Consideration in Precluding Summary Judgment

The EEO's perceptions, concerning Mr. Adam's ability to perform the essential functions of his position, are also a factor to be taken into consideration, in precluding summary judgment. In *Langon*, this Court viewed the EEOC's opinion as a factor, in determining that there was a factual dispute concerning whether the plaintiff could have performed the essential functions of her position, had she been granted the accommodation that she requested: "Further, the EEOC found that her 'handicap' could be accommodated if the agency permitted her to work full-time at home.'" *Langon*, 959 F.2d at 1061. In the instant case as well, Appellee's EEO Manager, David Prince, concluded that Mr. Adams is a qualified individual with a disability, who could have worked from home, after Mr. Prince

---

plaintiff's attending physician had stated that the plaintiff "was 'totally disabled' for both her job and any other work," *id.*, 122 F.3d at 468; and (2) the plaintiff was "emphatic" in not claiming a failure to accommodate. *Id.* at 464. In contrast, in the instant case, at the time of Mr. Adams' stroke, Dr. Davachi noted that Mr. Adams "is still able to operate with his right hand, see the computer screen and see all that is required for the job." R54-p,p.4.

spoke with Mr. Adams, Dr. Davachi, and Mr. Adams' manager; and, Mr. Prince

believes, after having viewed Mr. Adams' position description. R56, p.117  The

district court, inexplicably, had nothing to say about Mr. Prince's conclusions.

**4.     The District Court's Discussion of the DCOHR's Probable Cause Determination Is Hasty and Factually Incorrect**

The district court's discussion of the Probable Cause Determination, by the

DCOHR, is hasty and factually incorrect.  In the instant case, the DCOHR, similar

to the EEOC in *Langon*, determined that there is Probable Cause to believe that

Appellee discriminated against Mr. Adams by failing to provide him with the

reasonable accommodation of telework. R57-1,p.16.  The district court discounts

this determination as "the legal conclusions of one district employee," which, the

district court asserts, are countered by a "mountain of primary materials and sworn

testimony." R69,p.17.   This "mountain" is more akin to a black hole, in that

Appellee: (1) provided no medical documentation; (2) failed to attack Mr. Adams'

medical documentation; (3) offered no reference or citation to Appellee's

manager's deposition; (4) offered no reference to Appellee's EEO officer's

deposition; and (5) made only selective references to Mr. Adams' deposition.

Although a case that the district court cited, *Scott v. Johanns*, 409 F.3d 466

(D.C. Cir. 2005), states that a Probable Cause Determination may be admitted as

"evidence," there is no reason to believe that the district court evaluated the

Probable Cause Determination, as potential evidence, with even the slightest care,

in that the district court did not even know the date of the Determination. The district court asserts that it was issued in 2006. R69,p.17. In fact, the DCOHR issued its Letter of Determination on January 1, 2008, as is noted on the first page of the Letter. R57-1,p.2.

### 5.       The District Court Has Accepted, Entirely Uncritically, Appellee's Limited Evidence

As a counterweight to the Probable Cause Determination, the district court relies upon Appellee's limited, highly problematic evidence, including the Social Security application, written after Appellee had denied Mr. Adams reasonable accommodation. R54-6,p.2;R57,p.2. The district court appears to believe that a description of activities that Mr. Adams had been performing, prior to his stroke, including training, proves definitively that training requiring travel was essential to his position, after he had his stroke, even though (1) Appellee has provided no one from Appellee's management, who has provided such testimony; (2) Mr. Adams has testified that such travel was strictly voluntary; and (3) Dr. Davachi stated, after reviewing Mr. Adams' position description, that travel was not essential to Mr. Adams' position.

The district court also concluded, without evidence, that Mr. Adams' limited mobility, and difficulty standing, would prevent him from performing his job. Yet, his position description functions—which Dr. Davachi concluded that Mr. Adams was able to perform, after examining him, speaking to him, and reviewing his job

description, are, *inter alia*, such non-mobile tasks as  (1) completing reports; (2) training; (3) coordinating with vendors; (4) monitoring hardware performance; (5) overseeing protective measures, such as systems backup;  (6) providing Help Desk support; (7) coordinating projects; and (8) participating in meetings and conferences.  *Id.*   In performing these functions, Mr. Adams testified that he could sit all day. R57-3.  Again, the district court did not make any detailed analysis of Mr. Adams' position description before determining for itself the jury issue of whether Mr. Adams could have performed the essential functions of an IT specialist.

Further, the district court's uncritical reliance upon the disability application, and complete discounting of Mr. Adams' testimony, is contrary to the case law of this Circuit, as shall be discussed below.  Nor, contrary to the district court's conclusions, did Mr. Adams need to inform Appellee of a status change when, as a consequence of Appellee's failure to accommodate him, there was no status change.  He was still out of work.  The application did not address the issue of whether Mr. Adams could perform the essential functions of his position with reasonable accommodation, so there was nothing in his application to change.

Mr. Adams' explanation was the same as that which the Supreme Court held was sufficient in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999).  In *Cleveland*, as in the instant case, "the first statements . . . 'were made in a forum

40

which does not consider the effect that reasonable workplace accommodations would have on the ability to work[;]' and the statements at issue were "'accurate statements' if examined 'in the time period in which they were made.'" *Id.*, 795 U.S. at 807.  As the Supreme Court explained, " . . . when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." *Id.*, 526 U.S. at 804.  Thus, there was nothing in the application for Mr. Adams to change, given that Appellee continued to deny him reasonable accommodation.

> **6.    None of Appellee's Managers Contend that Mr. Adams Could Not, if Accommodated, Perform the Essential Functions of His Position**

To be sure, Appellee also provided Mr. Adams' position description, as the district court has noted. R69,p.10.  Yet, the district court has made no effort to balance the different functions, described in said position description, in terms of importance for the position, or appositeness to Mr. Adams' actual duties.  Above all, Appellee has provided no evidence from a manager of Appellee stating that Mr. Adams could not fulfill the functions of said position description.  In contrast, the head of Appellee's EEO office testified that Mr. Adams is a qualified individual, as did Dr. Davachi, who, again, has provided the only medical opinion in this case.

While the district court cites *Swanks v. Wash. Metro. Area Transit Auth.*,
179 F.3d 929 (D.C. Cir. 1999) for the proposition that a court will grant an
employer deference with respect to determining the essential functions of a
position R69,p.9, Appellee has provided no testimony, nor even an affidavit , from
a manager stating just what constitute the essential functions of Mr. Adams'
position.  In fact, as has been noted, the only employee of Appellee, other than Mr.
Adams, who testified on whether Mr. Adams could perform the essential functions
of his position, is Mr. Prince.  Thus, the only "employer judgment" in the record
confirms that Mr. Adams is a qualified individual.   In his assessment, Mr. Prince
also believes that he had a copy of Mr. Adams' position description. R56,p.117.

### 7. Appellee Has Tacitly Conceded that Mr. Adams Could Perform the Essential Functions of His Position

In assigning Mr. Adams training, albeit after the commencement of litigation
R58, and in installing a computer at his house R60, p.84, Appellee, at least tacitly,
has conceded Mr. Adams' status as a qualified individual.

### 8. The District Court's Own Citation Supports Mr. Adams' Contention that whether He Could Perform the Essential Functions of His Position Is a Jury Question

The district court's citation of *Swanks* is instructive, in that, in *Swanks*, this
Court held that whether an individual is qualified is "*a question of fact*," or of law;
and in that, in *Swanks*, "[t]he issue of qualification . . . involved a factual dispute."
*Id.*, 179 F.3d at 934 (emphasis added).  This Court further noted that, when

42

explanations have been rebutted, a jury may draw an inference of discrimination. *Swanks*, 179 F.3d at 936-937 (*citing Aka*, 156 F.3d 1284, 1292 (D.C. Cir. 1998)). In the instant case, Appellee's original rationale:  to wit, that Appellee could not provide reasonable accommodation, because Appellee had no telework policy in place, "rebuts" Appellee's subsequent attempt to assert that Appellee failed to provide reasonable accommodation, only because Mr. Adams is not a qualified individual.  Thus, this Court's analysis in *Swanks* would suggest that whether Appellee failed to provide Mr. Adams with reasonable accommodation because of "discrimination, rather than lack of qualification or undue hardship," is a jury question.  *See Swanks*, 179 F.3d at 937 (citations omitted).

>  **9.    The District Court Was Required to Consider, without Immediately, and Preemptorily Disregarding, Mr. Adams' Evidence**

The district court's immediate, and preemptory, disregard of all of Mr. Adams' evidence is contrary to this Court's holding in *Langon*, in which this Court found all of this evidence the plaintiff offered, including the plaintiff's own assessment of her ability to perform her job functions, to be significant and relevant, in determining that there was a factual dispute concerning whether the plaintiff, with accommodation, could have performed the essential functions of her position.  In view of this evidence, comparable to the evidence provided here, this Court held:  "In short, there was a genuine issue about whether, with the

accommodation she sought, Ms. Langon could perform the essential functions of her position." *Langon*, 959 F.2d at 1061.

Thus, in the instant case, in view of Mr. Adams' testimony, the conclusions of his physician, and the conclusions of Appellee's EEO manager—which, again, Appellee's EEO manager formed after consulting with Mr. Adams' physician—there is, as in *Langon*, a dispute of material facts concerning whether Mr. Adams would have been able to perform the essential functions of his position, had he received the reasonable accommodation that he requested. The district court here made no attempt to distinguish *Langon*. In fact, curiously, the district court's only reference to *Langon*, save for a general reference in a string cite R69,p.9, is a quotation from Mr. Adams' opposition to summary judgment, during the district court's brief discussion brushing aside the District of Columbia's Probable Cause determination. *Id.*, p. 17.

## IV.   The District Court Has Inappropriately Decided All Factual Disputes in the Light Least Favorable to Mr. Adams

### A.   Mr. Adams' Disability Application Is Consistent with His ADA Claims, in Law and in Fact

Mr. Adams' disability application is consistent with his ADA claims, in law and in fact. As has been noted above, Mr. Adams only applied for disability, because Appellee had not allowed him to telework. R58-4,p.5. Again, Mr. Adams applied for disability benefits on September 14, 2005 R54-6,p.2, the day after his

final counseling session, in which Appelle made clear that Appellee would not provide Mr. Adams with reasonable accommodation. R57,p.2.

Summary Judgment is thus inappropriate, in view of *Cleveland*, according to which a plaintiff may claim, for SSDI purposes, to be "totally disabled" and state, in an ADA claim, that he could "perform the essential functions " of his job, provided that the plaintiff gives an "explanation . . . sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.*, 526 U.S. at 807.

The explanation that the plaintiff in *Cleveland* provided, and that the U.S. Supreme Court accepted, was the same as Mr. Adams' explanation here:  to wit, "the first statements . . . 'were made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work[;]' and the statements at issue were "'accurate statements' if examined 'in the time period in which they were made.'" *Id.*

In the instant case, Mr. Adams made his representations concerning disability in the same SSA "forum " in which the plaintiff in *Cleveland* made her representations, a "forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." *Id.* As the

45

Supreme Court explained, " . . . when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." *Id.*, 526 U.S. at 804.  The Supreme Court so ruled, even though the plaintiff in that case had "reiterate[ed] that 'I am unable to work due to my disability.'" *Id.*, 526 U.S. at 799.

The logic by which the Supreme Court thus precluded summary judgment in *Cleveland*, in which the plaintiff requested a hearing and presented new evidence, applies, *a fortiori*, to the instant case.  The paragraph in Mr. Adams' application for disability benefits, which Appellee and the district court cite, makes no statement inconsistent with Mr. Adams' claim that he would have been able to perform the essential functions of his position, had he been immediately granted the requested telework.  Although the statement admitted that Mr. Adams' "cognitive abilities have been diminished due to the stroke," R54-6, p.12, (1) that statement does not state that the condition is permanent; (2) does not state that Mr. Adams could not perform the essential functions of his position, if allowed to work at home; and (3) must be juxtaposed with Dr. Davachi's diagnosis that Mr. Adams had full movement on his right side, and was capable of returning to work.  The statement (4) must also be juxtaposed with the medical notes, discussed above, which the district court fails to address.

46

While the district court accuses Mr. Adams of an "about-face" R69,p.13—an irony given that this entire case is based upon Appellee's about-face with respect to Mr. Adams—the district court simply brushes aside, without attempting to distinguish, this Court's holding in *Cleveland*, in which the claimant, who was held to be entitled to "proffer a sufficient explanation" for a "conflict involve[ing[ a legal conclusion," was, like Mr. Adams in the instant case,  a stroke victim who had both filed an ADA claim and sought SSA benefits.  *Id.* at 798.  It is thus contrary to *Cleveland* that the district court here finds objectionable Mr. Adams' having "reiterate[ed] that 'I am unable to work due to my disability,'" *id.*, 526 U.S. at 799, even though the Supreme Court found such a statement, on a Social Security application, to be consistent with an employee's claim to be a qualified individual.  *Id.*

**B.   The District Court Improperly Concluded that Mr. Adams Could Perform None of the Essential Functions of His Position, Except Write Reports, Simply because His Supervisor, Who Did Not Know the Essential Functions of Mr. Adams' Position, Planned to Assign Him Reports**

The district court also improperly concluded that Mr. Adams could not perform the essential functions of his position, save for writing reports, simply because his supervisor planned to assign him the task of writing reports. R69,p. *Id.*. p. 15.  Even more erroneously, the district court concludes that Mr. Adams

"contends" that "his newly defined job actually required nothing more than report writing." *Id.*

The supervisor's decision to assign Mr. Adams reports does not prove that Mr. Adams was only capable of writing reports, because the supervisor admitted that he did not know the essential functions of Mr. Adams' position. R60,pp.60,64. While the supervisor's sanguinity about Mr. Adams' writing reports confirms that the supervisor does not dispute Mr. Adams' ability to perform the essential functions of his position, Mr. Adams had, in fact, testified that he could do far more than write reports. R54-4,pp.238, 69-70. He had previously been engaged in such tasks as developing, implementing, and coordinating activities to protect information technology R54-4,p.176; and monitoring and evaluating system compliance. R57-3,pp.2-3. Given that the district court failed to address, let alone analyze, the different tasks described in Mr. Adams' position description, it has no factual basis for concluding that his abilities were limited to writing reports. Mr. Adams' testimony is bolstered by Dr. Davachi's diagnosis, which analyzed his position description at length. *Id.*

### C.    The District Court's Failure to Analyze Mr. Adams' Position Description, Except in Part, Undermines Its Factual Determination of what an IT Specialist Must Do

The district court's failure to analyze the position description, except in part, also undermines its factual determination of what an IT specialist must do. In

48

deciding this basic question of fact, a jury determination, which is in-and-of-itself improper, the district court has failed to provide anything more than "mere generalities."  Notably, the district court did not discuss, *inter alia*, the functions of (1) coordinating with vendors; (2) monitoring and reporting on the productivity and performance of hardware applications; (3) overseeing protective measures for the Legacy System, including system backups; (4) acting as a tape librarian; (5) providing offsite storage and password management; (6) coordinating and managing associated projects regarding systems; (7) acting upon knowledge of the technical aspects of the system; (8) acting upon knowledge of the departments' information infrastructure and data security; and (9) accomplishing this job from an offsite location via alternative measures, such as telephone/email/video conference/fax.  R57-3.

Moreover, the district court, having failed to include, let alone analyze, all aspects of Mr. Adams' position description, necessarily failed to analyze which elements constituted the bulk of Mr. Adams' duties.  The district court's conclusions that Mr. Adams "was required for work and to communicate orally," that he was unable to do so, and that his work required travel, are thus based on this incomplete analysis of Mr. Adams' position description, in addition to being based on (1) selective quotations from his deposition;  (2) a privileging of responses to leading questions;  and (3)  exclusion  of the diagnosis of Mr. Adams'

physician, based upon the district court's inaccurate and contradictory discussion

of said diagnosis.

### D.    The District Court Drew Improper Conclusions from Its Selective Consideration of Mr. Adams' Deposition Testimony

As has been noted above, the district court improperly decided for itself

which portions of deposition testimony concerning Mr. Adams' speech and

cognitive abilities which it would privilege.  The district court also decided,

without evidence, *inter alia*, that email assistance, provided by Mr. Adams at a

help desk, "would no longer be rendered in real time" at all.  R69,p.11.  This

conclusion conflicts with Dr. Davachi's diagnosis concerning Mr. Adams' ability

to function by telephone R54-9, p.4, and is, again, based upon selective portions of

Mr. Adams' deposition, contradicted by other portions of Mr. Adams' deposition

testimony.  The district court ignores altogether, as has been discussed above, Mr.

Adams' description of his daily regimen.  The district court thus took upon itself a

credibility determination, without the benefit of having heard Mr. Adams testify, or

having evaluated his demeanor.

### E.    The District Court Has Misconstrued the Case Law, with Respect to Mr. Adams' Social Security Application

To be sure, the district court also relies upon Mr. Adams' Social Security

Application. R69,pp.12-14.  Again, however, Mr. Adams filed that application

after Appellee had denied him reasonable accommodation.  The statement that he

was "unable to work because of [his] disabling condition," *id.*, p.12, was true only because of Appellee's failure to accommodate, and Mr. Adams would not have filed for Social Security benefits, and would not have made such a statement, had Appellee not denied him reasonable accommodation.

    Although the district court pays lip service to the Supreme Court's holding in *Cleveland* that a "representation of total disability . . . often implies a context-related conclusion" R69, pp. 12-13, the district court decided for itself the weight that it would give to a post-denial application. Yet, as this Court reiterated in *Whitbeck v. Vital Signs*, 115 F.3d 588, 591 (D.C. Cir. 1997), a Social Security disability application does not take into account what a person would do if granted accommodation. *Whitbeck*, 115 F.3d at 591.[4]

---

[4] This Court, in *Whitbeck*, also rejected the district court's position here, that the employer was not required to create a new position R69,p.16, since, as here, that is not the solution that the plaintiff was seeking. *Whitbeck*, 116 F.3d at 592. *Carter v. Tisch*, 822 F.2d 465 (4th Cir. 1087), cited by the district court, is inapplicable, in that (1) the plaintiff in that case, unlike here, sought light duty, when no light duty positions were available, *id.* at 466; and (2) granting the requested light duty assignment would have been in violation of a collective bargaining agreement, requiring five years of service as a prerequisite for a light duty assignment. *Id. Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001), also cited by the district court, is inapposite, in that in *Lucas*, (1) there was not a vacancy at the employer's other facility for a customer service representative, *id.*, 257 F.3d at 1257; (2) the positions for which the employee had interviewed would have been a promotion, *id.*; (3) the employee failed to show that he was qualified to perform the physical labor required, *id.*, 257 F.3d at 1259; and (4) the entire position was being restructured. *Id.*, 257 F.3d at 1254. In contrast, in the instant case, Dr. Davachi preserved Mr. Adams' position description almost entirely, and only indicated that Mr. Adams could not work in an office setting, or in a sedentary position. R57-3.

Also in *Whitbeck*, this Court held that, as here, in view of the plaintiff's allegation, together with evidence in the record that her doctor believed she could do her job with the requested accommodation, "a reasonable jury could find that Whitbeck proposed a reasonable accommodation which would allow her to work again as a Vital Signs sales representative." *Whitbeck*, 116 F.3d at 592 (citations omitted).

Further, in *Whitbeck*, in another holding apposite to the instant case, this Court held that post-denial actions were "understandable." *Id.* As here, the plaintiff applied for disability benefits, because the employer "had previously denied her request" for accommodation. *Id.* Moreover, contrary to the district court's holding here, according to this Court's ruling in *Whitbeck*, a statement by a plaintiff about inability to work is not dispositive: "To a reasonable jury, however, Whitbeck's statement that she was no longer able to perform her job might be nothing more than an accurate description of her condition—without accommodation, she *was* unable to work." *Id.*, 115 F.3d at 593 (emphasis in original).

---

Yet, he noted the position description's reference to the employee's working from a "remote location." *Id.* At the very least, in view of Dr. Davachi's having left intact almost all of Mr. Adams' position description functions, there is a dispute of fact concerning Mr. Adams' ability to perform them.

Again, this analysis applies, *a fortiori*, to the instant case, in which Mr. Adams never stated that he was "unable to work." The passage that the district court, echoing Appellee, cites from Mr. Adams' application is in response to a question concerning "illnesses, injuries or conditions that *limit* your ability to work." R54-6,p.12. But, as is clear from Dr. Davachi as well as from Plaintiff, Mr. Adams would have been able to work, had Defendant granted him accommodation.

Thus, this Court held that summary judgment is inappropriate where, as here, a form does not address the ability of an employee to work with accommodation, and where, as here, there is evidence that a physician believes that the employee could work with the requested accommodation:

> Because the April 14 form does not address Whitbeck's ability to work with accommodation, and because the record contains evidence that Kattah believed Whitbeck could work with assistance, a jury could reasonably find that Whitbeck would have been able to work with her requested accommodation—a motorized cart." *Id.*

This Court accordingly reversed the U.S. District Court.

In contrast, *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390 (7th Cir. 2005), another authority outside of this Circuit that the district court cites, is inapposite, in that, in *Opsteen*, unlike here, the plaintiff "had to demonstrate that he could not do his former work *even with a reasonable accommodation*. His wife made that representation on his behalf, with considerable medical support." *Opsteen*, 408 F.3d at 392 (emphasis in original). There was no such representation in Mr.

53

Adams' application, which did not address the issue of Mr. Adams' ability to

work, *with* reasonable accommodation.[5]

### F.    Appellee Subjected Mr. Adams to a Hostile Work  Environment

Appellee has subjected Mr. Adams to a hostile work environment, in that,

*inter alia*, (1) Mr. Strassman, after learning about Mr. Adams' disability,

questioned the need and value of Mr. Adams' position R54-4,p.229; (2) telephoned

Mr. Adams' house and both screamed at Mr. Adams' wife and used abusive

language R54-4, pp.218-19;R58-5; (3) told Mr. Adams, who was impaired, that he

would need to take public transportation to preserve his job R 54-4, pp. 219-220;

and (4) treated Mr. Adams with such disdain that he never bothered to learn the

---

[5] The district court also cites *Solomon v. Vilsack*, 628 F.3d 555 (D.C. Cir. 2010), in which this Court concluded that claims for disability retirement do not bar Rehabilitation Act claims, and vacated a district court's entry of summary judgment. *Id.*, 628 F.3d at 557. This Court found significant that, as in the instant case, the application forms "nowhere directly ask applicants whether they can perform the essential functions of their positions with reasonable accommodations," *id.*, 628 F.3d at 563; or "require applicants to expressly represent that their disabilities cannot be reasonably accommodated." *Id.* As in *Solomon*, Mr. Adams' application for disability benefits does not contradict his reasonable accommodation claims, in that (1) Mr. Adams did not file for disability benefits until after he had been denied reasonable accommodation; and (2) his disability benefits application did not address his ability to perform the essential functions of his position, had he been granted reasonable accommodation. As this Court held:  "We believe Solomon has sufficiently reconciled any facial tension that might exist between the statements in her FERS application and her accommodation claim.  Nowhere in Solomon's application did she directly discuss whether she could have worked with reasonable accommodations, nor did the application forms call for her to do so." *Id.*, 628 F.3d at 566.

nature of Mr. Adams' position, and made it clear that he was happy to do without

Mr. Adams. R60,pp. 60, 64;R54-4, pp.224-25.

The district court characterizes this conduct as amounting to nothing more

than "mild slights." R69,p.6. Yet, in one of the cases cited by the district court,

*Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99 (D.D.C. 2010), the court

noted that a relevant factor is the extent to which allegedly discriminatory conduct

"interfered with the employee's work performance." *Id.*, 679 F. Supp. 2d 99.

Telling a stroke victim that he needs to take public transportation to keep his job,

that the supervisor is not certain that the employee's position is still needed, and

refusing to find a way of accommodating the employee, while making it clear that

he would happily do without the employee, are all actions that necessarily interfere

with work performance. It would be difficult to work effectively, while knowing

that effective and diligent work make no difference to a snide and disdainful

manager. At the very least, this is a dispute of fact.

Mr. Strassman's decision to violate Mr. Adams' home, with his abusive

conduct, rather than being irrelevant to the workplace, demonstrate that (1) Mr.

Strassman's disdain and hostility were not limited to the physical confines of the

Agency; and (2) the hostility from the workplace was spreading to the environment

in which Mr. Adams was seeking to work: his home. Under these circumstances,

the district court's assumption that these developments, in Mr. Adam's home, are

55

somehow isolated from Mr. Strassman's actions in the workplace is at best contrived.

This Court, in *Leavitt*, 407 F.3d at 405, held that, in determining whether there is a hostile work environment, a court must "loo[k] at all the circumstances," *id.* at 416, including whether the alleged incidents were "isolated." *Id.* at 417. This Court also examined whether the alleged conduct "unreasonably interferes with an employee's work performance." *Leavitt*, 407 F.3d at 416 (*citing Harris v. Forklift Systems*, *Inc.*, 510 U.S. 17, 23 (1993)).

With respect to the "totality of the circumstances," in the instant case, these hostile acts and statements by Mr. Strassman were the *only* exchanges between Mr. Adams and Mr. Strassman. Thus, these exchanges, in addition to interfering with Mr. Adams' work performance, were, as the only types of exchanges that Mr. Adams experienced with Mr. Strassman, scarcely isolated.

Moreover, contrary to the district court's assertions, this conduct, on Mr. Strassman's part, is entirely based upon Mr. Adams' disability. A directive, that an employee take public transportation, was necessarily hurtful to a disabled employee. Mr. Strassman also only questioned the need for Mr. Adams' position, after Mr. Adams requested reasonable accommodation. It was in this context that Mr. Strassman, by questioning Mr. Adams', and his position's worth, was making comments that necessarily interfered with his ability to perform his work.

The district court has, once again, interpreted a rather straightforward cause-and-effect analysis in the light least favorable to Mr. Adams.  Whether Mr. Strassman was subjecting Mr. Adams to a hostile work environment; whether his abuse was ongoing and reflective of the only contact he had with Mr. Adams; and whether his conduct interfered with Mr. Adams' ability to perform his job, are all disputed questions of fact.

### G.    The D.C. Court Improperly Dismissed Mr. Adams' DCHRA Claims

#### 1.    *Anderson v. U.S. Safe Deposit Company* Does Not Apply to the Instant Case, in which the DCOHR Had Found Probable Cause

The district court improperly held that Mr. Adams "did not successfully withdraw his DCHRA complaint," and is thus barred from pursuing a judicial remedy after pursuing an administrative remedy. R18, p.25.  The district court improperly relied upon a 20-year-old case in the District of Columbia superior court, *Anderson v. U.S. Safe Deposit Company*, 522 A.2d 859 (D.C. Ct. App. 1989), in which the court expressly stated that, had the DCOHR found Probable Cause, a different conclusion could arguably have been drawn.

That is, the court in *Anderson* expressly stated that the court might have assumed, *arguendo*, that determination of Probable Cause does not foreclose an administrative complainant from pursuing a juridical remedy.  *Id.* at 862.  Thus,

*Anderson* does not bar a judicial remedy when, as here, the DCOHR has found Probable Cause.

Although the district court here held that *Anderson* applies to a case in which the DCOHR has found Probable Cause, the court's language in *Anderson* suggests, at least *arguendo*, that a judicial remedy would necessarily be barred only when the DCOHR has found No Probable Cause.  Mr. Adams had specifically referred to the *Anderson* court's *arguendo* position, with respect to a finding of Probable Cause.  R12,p.29.

In addition, the district Court failed to address Mr. Adams' contentions that the court, in *Anderson*, by its own admission, (1) took a position contrary to that taken by the District Court of the District of Columbia in three separate cases: *Jones v. Management Partnership*, *Inc.*, 32 Fair Empl. Prac. Cas. (BNA) 639, 640 (D.C.C. 1983); *Blake v. American College of Obstetricians & Gynecologists*, 608 F. Supp. 1239 (D.D.C. 1985); and *Weaver v. Gross*, 41 Empl. Prac. Dec. (CCH), [Sections] 36, 446 (D.D.C. 1986) [1986 WL 7553].  *See Anderson*, 552 A.2d at 861 (citations already provided).

Further, at the time that *Anderson* was decided, the DCOHR was not empowered to adjudicate complaints and issue remedial orders, *id.* at 860, and so DCOHR had completed its investigation.  *Id.*  In the instant case, however, under the procedures of the DCOHR 20 years later, the case was still before the

independent hearing examiner of the DCOHR, so DCOHR had not completed its

investigation, as Mr. Adams has argued. R12-4, p.2.

> **2.     The District Court's Holding that Mr. Adams Was Not
> Required to Exhaust His Administrative Remedies under
> Section 794 of the Rehabilitation Act Should Not be Applied
> Retroactively to Mr. Adams**

The district court's holding that Mr. Adams was not required to exhaust his

administrative remedies under Section 794 of the Rehabilitation Act should not be

applied retroactively to Mr. Adams.  Prior to  the district court's decision to

dismiss Mr. Adams' DHOHR claims, as the district court had noted, "courts in this

district have struggled to determine what types of 'standards' should be borrowed

from the ADA when evaluating a claim brought under [Section] 794 of the

Rehabilitation Act." R18, p.9;R22,pp.1-2.  In view of the split of opinion, Mr.

Adams was justified in believing that he was required to exhaust his administrative

remedies.  Further, two of the cases cited by the district court, *Stewart v. Dist. of

Columbia*, 2006 WL 626921 (D.D.C. 2006) and *Gordon v. Dist. of Columbia*, 605

F. Supp. 2d 239 (D.D.C. 2009), do not specifically address the issue of whether a

plaintiff is required to exhaust his administrative remedies.  The one case cited by

the district court, which does address this issue, *Jones v. Univ. of Dist. of

Columbia*, 505 F. Supp. 2d 78 (D.D.C. 2007), only addresses the issue in passing,

and does not stand for the contention that a plaintiff's claims should be dismissed,

pursuant to the statute of limitations, because the plaintiff was not required to

exhaust his administrative remedies, and chose to exhaust said remedies

nonetheless.  Nor does the Supreme Court's holding in *Johnson v. Ry. Express*

*Agency*, *Inc.*, 421 U.S. 454 (1975) apply to the Rehabilitation Act.

Because the district court, in dismissing Mr. Adams' claims under the

DCOHR, was relying upon the presumption that different statutes have different

remedies, none of the cases cited by this the district court, which do not expressly

refer to the Rehabilitation Act, should apply.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's decision to grant summary

judgment to Appellee was legal error that this Court should reverse.

Respectfully submitted,

/s/ James L. Fuchs
Michael J. Snider, Esq., #24695
James L. Fuchs, Bar #17092
Snider & Associates, LLC
600 Reisterstown Road
Seventh Floor
Baltimore, MD 21208
410-653-9060 phone
410-653-9061 fax
jfuchs@sniderlaw.com email
ecf@sniderlaw.com email
Attorneys for the Plaintiff

# <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*14,000*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>November 19, 2014</u>          <u>/s/ James L. Fuchs</u>
                                          *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 19th day of November, 2014, I caused this

Corrected Page Proof Brief of Appellant to be filed electronically with the Clerk of

the Court using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

> Holly M. Johnson
> OFFICE OF THE ATTORNEY GENERAL,
>   DISTRICT OF COLUMBIA
> OFFICE OF THE SOLICITOR GENERAL
> 441 4th Street, NW
> One Judiciary Square, Sixth Floor
> Washington, DC  20001
> (202) 727-3400
>
> *Counsel for Appellee*

I further certify that on this 19th day of November, 2014, I caused the

required copies of the Corrected Page Proof Brief of Appellant to be hand filed

with the Clerk of the Court.

/s/ James L. Fuchs
*Counsel for Appellant*

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

28 U.S.C. § 1291 .............................................................................Add. 1

28 U.S.C. § 1331 .............................................................................Add. 1

29 U.S.C. § 701 *et seq.* .................................................................Add. 1

29 U.S.C. § 794 ...............................................................................Add. 3

42 U.S.C. § 1201 *et seq.* ...............................................................Add. 4

D.C. Code § 2.1401.01 *et seq.* ......................................................Add. 4

## 28 U.S. Code § 1291 – Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292 (c) and (d) and 1295 of this title.

## 28 U.S. Code § 1331 - Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 29 U.S. Code § 701 - Findings; purpose; policy

(a) **Findings**
Congress finds that—
(1) millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing;
(2) individuals with disabilities constitute one of the most disadvantaged groups in society;
(3) disability is a natural part of the human experience and in no way diminishes the right of individuals to—
(A) live independently;
(B) enjoy self-determination;
(C) make choices;
(D) contribute to society;
(E) pursue meaningful careers; and
(F) enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society;
(4) increased employment of individuals with disabilities can be achieved through implementation of statewide workforce investment systems under title I of the Workforce Investment Act of 1998 [29 U.S.C. 2801 et seq.] that provide meaningful and effective participation for individuals with disabilities in workforce investment activities and activities carried out under the vocational rehabilitation program established under subchapter I of this chapter, and through the provision of independent living services, support services, and meaningful opportunities for

Add. 1

employment in integrated work settings through the provision of reasonable accommodations;

(5) individuals with disabilities continually encounter various forms of discrimination in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and public services; and

(6) the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to—

(A) make informed choices and decisions; and

(B) achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals.

(b) **Purpose**

The purposes of this chapter are—

(1) to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through—

(A) statewide workforce investment systems implemented in accordance with title I of the Workforce Investment Act of 1998 [29 U.S.C. 2801 et seq.] that include, as integral components, comprehensive and coordinated state-of-the-art programs of vocational rehabilitation;

(B) independent living centers and services;

(C) research;

(D) training;

(E) demonstration projects; and

(F) the guarantee of equal opportunity; and

(2) to ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities, especially individuals with significant disabilities, and in assisting States and providers of services in fulfilling the aspirations of such individuals with disabilities for meaningful and gainful employment and independent living.

(c) **Policy**

It is the policy of the United States that all programs, projects, and activities receiving assistance under this chapter shall be carried out in a manner consistent with the principles of—

(1) respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities;

(2) respect for the privacy, rights, and equal access (including the use of accessible formats), of the individuals;

(3) inclusion, integration, and full participation of the individuals;
(4) support for the involvement of an individual's representative if an individual with a disability requests, desires, or needs such support; and
(5) support for individual and systemic advocacy and community involvement.

## 29 U.S. Code § 794 - Nondiscrimination under Federal grants and programs

(a) **Promulgation of rules and regulations**
No otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

(b) **"Program or activity" defined**
For the purposes of this section, the term "program or activity" means all of the operations of—
(1)
(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
(2)
(A) a college, university, or other postsecondary institution, or a public system of higher education; or
(B) a local educational agency (as defined in section 7801 of title 20), system of vocational education, or other school system;
(3)
(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—
(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

Add. 3

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

(c) **Significant structural alterations by small providers**

Small providers are not required by subsection (a) of this section to make significant structural alterations to their existing facilities for the purpose of assuring program accessibility, if alternative means of providing the services are available. The terms used in this subsection shall be construed with reference to the regulations existing on March 22, 1988.

(d) **Standards used in determining violation of section**

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, [1] of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

## 42 U.S. Code § 1201 - Authorization of appropriations

For the purpose of enabling each State to furnish financial assistance, as far as practicable under the conditions in such State, to needy individuals who are blind, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health and Human Services, State plans for aid to the blind.

## D.C. Code § 2–1401.01. Intent of Council.

It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic

Add. 4

information, disability, source of income, status as a victim of an intrafamily offense, and place of residence or business.