NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

No. 14-7092

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ALBERT J. ADAMS,

APPELLANT,

V.

DISTRICT OF COLUMBIA,

APPELLEE.

———————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR APPELLEE DISTRICT OF COLUMBIA**

———————————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES ..............................................................................1

STATEMENT OF THE CASE................................................................................2

    1.    As An IT Specialist, Adams Is Responsible For Maintaining And Operating The Department Of Mental Health's Centralized Database, Training Staff On New Software, And Operating The IT Help Desk. ...............................................................................2

    2.    Adams Suffers A Massive Stroke That Impairs His Ability To Move, Speak, And Think.....................................................7

    3.    The Department Denies Adams's Request To Work From Home. ...................................................................................9

    4.    In An Effort To Settle Adams's Administrative Claims, The Department Tries To Create A Job That Adams Can Perform From Home....................................................................13

    5.    OHR Finds Probable Cause That The Department Violated The HRA...............................................................................14

    6.    The District Court Dismisses Some Claims On Procedural Grounds And Grants The District's Motion For Summary Judgment Against Adams On The Remainder. ...................15

STANDARD OF REVIEW .................................................................................17

SUMMARY OF ARGUMENT............................................................................18

ARGUMENT .......................................................................................................20

    I.    Adams Was Not Qualified For Relief Under The ADA Or Rehabilitation Act Because He Would Not Have Been Able To Perform The Essential Functions Of His Position Even If He Had Been Permitted To Work From Home. .......................................20

        A.    Adams cannot claim that he could perform the essential functions of his position at the relevant time because the

factual statements he made in his Social Security application conclusively establish that he could not. ................24

B.   Other undisputed evidence establishes that Adams could not perform many of his essential functions after his stroke. ......................................................................................33

1.   Training staff was an essential function, and Adams conceded that he could not perform this function. ...........................................................................33

2.   Operating the help desk was an essential function, and Adams's slurred speech and inability to provide in-person support prevented him from performing this function. .................................................36

3.   An IT specialist was required to analyze complex problems and keep abreast of rapidly changing technology, and Adams offered insufficient evidence that he could do this after his stroke left him cognitively impaired. ................................................38

C.   Because Adams was not qualified under the ADA, the District is entitled to summary judgment on his failure-to-accommodate claim, regardless of its response to his accommodation request. ..........................................41

II.   Adams Did Not Suffer A Hostile Work Environment. ......................48

III.   Adams Forfeited His Right To Bring An HRA Claim In Court By Pursuing His Administrative Remedies With OHR. ....................50

CONCLUSION ....................................................................................55

ii

# TABLE OF AUTHORITIES*

## *Cases*

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008)................................53

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ....................................................18

*\*Anderson v. U.S. Safe Deposit Co.*, 552 A.2d 859 (D.C. 1989).......... 51, 53, 54, 55

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).........................................48

*Bakersville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995)................................50

*Barber v. Nabors Drilling U.S.A.*, 130 F.3d 702 (5th Cir. 1997)............................22

*\*Basden v. Prof'l Transp.*, 714 F.3d 1034 (7th Cir. 2013) ......................... 21, 30, 46

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................................. 17, 18

*Blair-Bey v. Quick*, 151 F.3d 1036 (D.C. Cir. 1998)...............................................51

*Brown v. Capitol Hill Club*, 425 A.2d 1309 (D.C. 1981) ................................. 51, 52

*Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043 (8th Cir. 1999).................. 21, 30

*Burch v. City of Nacogdoches*, 174 F.3d 615 (5th Cir. 1999) .................................22

*\*Butler v. Round Lake Police Department*, 585 F.3d 1020 (7th Cir. 2009) .... 28, 29, 33

*\*Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994)................................................... 21, 42

*Carter v. District of Columbia*, 980 A.2d 1217 (D.C. 2009) ............... 50, 51, 52, 53

---

*        Authorities upon which we chiefly rely are marked with asterisks.

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999) .. 24, 25, 27, 29

*Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship*, 264 F.3d 999 (10th Cir. 2001) ...............................................................................46

*Conley v. Gibson*, 355 U.S. 41 (1957) ..................................................17

*Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161 (D.C. Cir. 2013) ......................54

*\*Detz v. Greiner Industries*, 346 F.3d 109 (3d Cir. 2003)........................................28

*Duello v. Buchanan Cnty. Bd. of Supervisors*, 628 F.3d 968 (8th Cir. 2010) ... 21, 30

*EEOC v. LHC Grp.*, 2014 U.S. App. LEXIS 23295 (5th Cir. 2014) ......................22

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007)...........................................................17

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ..................................... 48, 50

*Feldman v. American Memorial Life Insurance*, 196 F.3d 783 (7th Cir. 1999) ......27

*Galvin v. Eli Lilly & Co.*, 488 F.3d 1026 (D.C. Cir. 2007) ....................................26

*\*Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674 (7th Cir. 2010) ......................................................... 22, 23

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993)..............................................................48

*Johnson v. ExxonMobil Corp.*, 426 F.3d 887 (7th Cir. 2005) .................................25

*Keith v. Cnty. of Oakland*, 703 F.3d 918 (6th Cir. 2013) .......................................46

*Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736 (10th Cir. 2013)................47

*Langdon v. HHS*, 959 F.2d 1053 (D.C. Cir. 1992)........................................... 43, 44

iv

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) ...............................47

*Majors v. GE Elec. Co.*, 714 F.3d 527 (7th Cir. 2013)..............................................42

*Mathews v. Denver Newspaper Agency*, 2011 U.S. App. LEXIS 11454 (10th Cir. 2011)...............................................................................................................................32

*McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1 (D.C. Cir. 2010) ....................................................................................................................................47

*Mitchell v. Washingtonville Central School District*, 190 F.3d 1 (2d Cir. 1999).....27

*Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446 (11th Cir. 1996) ................................42

*Opsteen v. Keller Structures*, 408 F.3d 390 (7th Cir. 2005)...................................33

*Pyramid Sec. v. IB Resolution*, 924 F.2d 1114 (D.C. Cir. 1991)......... 25, 26, 31, 32

*Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001) ................................46

*Reed v. Petroleum Helicopters*, 218 F.3d 477 (5th Cir. 2000) ...............................27

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ................................18

*Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000) ....................................41

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006)............................................17

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013).................................................53

*Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014) ...................................... 21, 22, 48

*Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002)........................................... 49, 50

*Swanks v. WMATA*, 179 F.3d 929 (D.C. Cir. 1987).................................................21

*Talavera v. Sch. Bd. of Palm Beach Cnty.*, 129 F.3d 1214 (11th Cir. 1997)...........34

*Tatum v. Hyatt Corp.*, 918 F. Supp. 5 (D.D.C. 1994)................................................50

*Ward v. McDonald*, 762 F.3d 24 (D.C. Cir. 2014) ....................................................22

*Whitbeck v. Vital Signs*, 116 F.3d 588 (D.C. Cir. 1997)..................................... 24, 25

*Willis v. Conopco, Inc.*, 108 F.3d 282 (11th Cir. 1997)...........................................42

*Wood v. Green*, 323 F.3d 1309 (11th Cir. 2003)........................................................47

### Statutes

29 U.S.C. § 791 ...........................................................................................................21

29 U.S.C. § 794 ...........................................................................................................15

42 U.S.C. § 12111 ............................................................................................. 20, 21, 23

42 U.S.C. § 12112(b)(5)(A) ........................................................................................20

42 U.S.C. § 12201 et seq.,............................................................................................9

42 U.S.C. § 2000e-2 et seq. .........................................................................................16

D.C. Code § 2-1401.01 ................................................................................................13

D.C. Code § 2-1403.04 ................................................................................................51

D.C. Code § 2-1403.16(a)..................................................................................... 51, 53

### Regulations

29 C.F.R. § 1614.203(b)...............................................................................................21

29 C.F.R. § 1630.2(n)(1) ....................................................................................... 22, 41

4 DCMR § 109 .............................................................................................................15

4 DCMR § 110 ..................................................................................................... 15, 55

4 DCMR § 116 ........................................................................................55

## STATEMENT OF THE ISSUES

Albert Adams was employed as an information technology specialist for the District of Columbia Department of Mental Health when he suffered a massive stroke that left him seriously disabled and unable to work outside his home. The agency denied his request to work from home, and he sued under federal and District law. The district court dismissed some claims on procedural grounds and granted the District's motion for summary judgment on the remainder. Adams's appeal raises three issues:

1. Whether the district court properly found Adams unqualified for an accommodation under the Americans With Disabilities Act and the Rehabilitation Act as a matter of law because he could not have performed the essential functions of his position even if allowed to work from home, where his own admissions established that his job required him to be physically active, to travel throughout the District, to be able to speak clearly on the telephone, and to analyze novel and complex technical problems, and Adams admitted he could not perform these functions after his stroke.

2. Whether the district court properly found insufficient evidence of a hostile work environment, where Adams testified only that his supervisor had made two insensitive statements in one phone call and his wife testified that his supervisor had yelled at her on the telephone on one occasion.

3.  Whether the district court properly dismissed Adams's claim under the District of Columbia Human Rights Act because he had exercised his choice under District law to seek an administrative rather than judicial remedy by seeking relief from the District of Columbia Office of Human Rights and not timely withdrawing his administrative complaint.

## STATEMENT OF THE CASE

Making all reasonable inferences in favor of Adams, the summary judgment record establishes the following facts:

**1.    As An IT Specialist, Adams Is Responsible For Maintaining And Operating The Department Of Mental Health's Centralized Database, Training Staff On New Software, And Operating The IT Help Desk.**

Adams began working as an information technology ("IT") contractor for the Department of Mental Health ("Department")[1] in May 2001 and was hired as a permanent employee in 2002 or 2003.  District Court ECF Record Document ("RD") 54-4 at 87-88; RD 55-1 at 12.  As an IT specialist, he was responsible for maintaining and operating "STAR" and "NOMAD"—programs supporting a centralized database that captured, stored, and processed information regarding patients treated for mental illness at St. Elizabeths Hospital and other treatment centers in the District.  RD 54-4 at 54-60, 63-67, 71-72; RD 54-5 at 2; RD 54-6 at 13-14.  The database tracked admissions, treatment, discharge, and billing, and it

---

[1]      The agency is now named the Department of Behavioral Health.

2

could be accessed by "multiple users" from "various locations."  RD 54-4 at 60; RD 60 at 37.  Adams supervised six other employees, trained staff on the software used to access the database, operated the database's help desk, scheduled the generation of reports, and diagnosed and repaired problems with the database's hardware and software.  RD 54-4 at 60; RD 54-5 at 2-4; RD 54-6 at 13-14.  He had no personal assistant or secretary—he was solely responsible for carrying out the functions essential to his position.  RD 54-4 at 126.

According to Adams's official position description, an IT specialist's "major duties" include "train[ing] staff," "provid[ing] Help Desk support to users and other information systems staff as it relates to the core computer systems," and "[p]lan[ning] and implement[ing] difficult and complex assignments and develop[ing] new methods, approaches, and procedures."  RD 54-5 at 2-3.

Adams himself described the job as physically demanding in his application for Social Security Disability Insurance ("Social Security"), which he submitted under oath in September 2005.  RD 54-6 at 6, 7, 13-14.  When asked to "[d]escribe [his] job"—to explain "[w]hat . . . [he] d[id] all day"—he stated that he "[taught] classes on computer software and hardware, traveled to various locations to train persons on computer software and hardware," and "worked on [a] computer

3

database."[2]  RD 54-6 at 13.  And when he was asked to state "how many total hours [he] spent each day" engaging in certain physical activities, he reported that he sat for only one hour each day; he spent the other seven hours walking, standing, stooping, kneeling, crouching, crawling, and reaching, while he handled computers and related equipment, some of which weighed more than 50 pounds. RD 54-6 at 13-14.

Although Adams submitted an affidavit at summary judgment stating, "[e]verything that I wrote on my application is true," RD 58-4 at 5, he bases several arguments on his own conflicting deposition testimony.  For example, he admitted in his opposition to summary judgment that he had been "responsible for training agency staff on computer systems" when he was hired, RD 55-1 at 12, and testified that he had conducted "a lot" of training sessions when the Department "first implemented" the online database in 2003 or 2004, RD 54-4 at 89, 170, 172-73.  He also testified, however, that he was no longer required to conduct training as of 2005 because, by then, existing employees had been trained on the database and the "training center" was able to train new employees.  RD 54-4 at 64-67, 89, 170-71.

---

[2]    In this application, Adams responded to questions using all capital letters.  In this brief, the District has replaced these with lower-case letters for ease of reading.

4

Adams also admitted at deposition that, because he was required to provide technical support to customers who called the help desk for assistance, he had to be able to communicate effectively on the telephone. RD 54-4 at 63-64, 124-25, 247, 252. In his performance evaluation, he was rated for the quality of his "interaction with customers to ensure timely and accurate input and output." RD 54-4 at 63. His position description corroborated this, stating that an IT specialist must have the "[a]bility to communicate both orally and in writing to provide expertise and training, prepare reports, make oral presentations, provide customer service, and present findings." RD 54-5 at 3.

In addition to providing technical support over the telephone, Adams provided in-person support at least once a week at various customer locations. RD 54-4 at 57, 60; *see* RD 54-4 at 66-67, 96-97. He explained: "if I didn't understand a client, if I didn't understand what a client's request was, . . . I would go and see if I could help them." RD 54-4 at 57. He testified, however, that this on-site support was not a "requirement" for his job, and that he could have adequately operated the help desk without ever leaving his office. RD 54-4 at 55; *see* RD 54-4 at 74, 91-92. He explained: "It was . . . just something that I did in order to help me be able to help a customer." RD 54-4 at 93. "I did it because it helped me to help the client to understand their problem." RD 54-4 at 95.

5

As the position description explained, an IT specialist also needed to be able to think clearly—he needed to be able to "solve problems, conduct analyses, prepare written evaluative technical and non-technical documents for implementing and maintaining new and existing systems," and "develop[] new methods and techniques" in "many areas of uncertainty in approach and methodology." RD 54-5 at 4. He also had to be able to "[p]rovide[] advice and guidance on a wide range and variety of complex information technology issues, policies, standards, and guidelines," and "[e]valuate[] and recommend[] adoption of new or enhanced approaches to delivering information technology services." RD 54-5 at 2.

In his deposition, Adams described the complexity of the software he managed: STAR and NOMAD had "different . . . database structures," "[a]nd [their] hierarchy . . . had to be maintained." RD 54-4 at 75. At the time of Adams's stroke, NOMAD was being "phased out," which meant that he had little or no technical support from the program's vendor. RD 55-7 at 3; *see* RD 54-4 at 240. The Department "had brought in eCura," a new program which "interact[ed] with" STAR, but not NOMAD. RD 54-4 at 82-83. Adams admitted that he was only "[a] little bit" familiar with eCura, because the Department was "just beginning to interface" with it in 2005. RD 54-4 at 83, 203. And he "had no idea what the new system [to replace NOMAD] might have been." RD 54-4 at 242.

6

**2.      Adams Suffers A Massive Stroke That Impairs His Ability To Move, Speak, And Think.**

On May 8, 2005, Adams suffered a massive stroke that required hospitalization and residential rehabilitative treatment.  RD 54-4 at 106; RD 58-4 at 2.  He returned home on July 29, 2005.  RD 54-4 at 106.

The stroke left him significantly impaired.  In his sworn Social Security application, he reported:

> He has bleeding from brain.  He cannot walk without the assistance of a walker, has to lie down all the time because he becomes weak and cannot stand or walk for more than 10 minutes.  The left side of his body is paralyzed and as a result he does not have control over the left side of his body.  He drags the left side of his body when he moves. His face droops on the left side.  His left eye stays closed most of the time.  His tongue aches, feels heavy and thick and as a result his speech is slurred.  He coughs a lot due to heavy breathing from the stroke.  He has incontinence.  His cognitive abilities have been diminished due to the stroke.

RD 54-6 at 12.

Although Adams cannot remember much about the months following his stroke, *see* RD 54-4 at 119, 225, he corroborated many of these claims in his deposition.  He testified that, in the years after his stroke, he could not coordinate, control, or balance the left side of his body, which made him unable to stand, walk alone, drive, or use public transportation.  RD 54-4 at 134; *see* RD 54-9 at 4.  As a result, he could not travel outside the home for work.  RD 54-4 at 105.

7

Adams testified that his speech was "slurred" for "two, three years" afterward.  RD 54-4 at 111, 222.  His speech suddenly stopped being slurred in 2007, when he "found [him]self speaking clearly," and someone told him: "You're speaking a lot clearer.  I can understand you."  RD 54-4 at 116, 222.  He agreed that, "prior to that, [people] hadn't been able to understand [him]."  RD 54-4 at 222.  When asked whether, "from 2005 until 2007 it would have been very difficult for [him] to have communicated with people calling and asking for direction over the phone," Adams responded "yes," adding: "Not impossible, but yes, difficult."  RD 54-4 at 253.  However, in an affidavit executed in 2014, Adams's physician, Dr. Khrosow Davachi, noted that he had "spoke[n] with [Adams]" in August 2005, "and was able to understand him without difficulty."  RD 58-6 at 2.

Adams admits that, in the months after he returned home from residential care, his "thinking process . . . was not functional."  RD 54-4 at 110.  He "had some cognitive impairment" and was "easily confused."  RD 54-4 at 111, 119-20, 122-23.  Some of this impairment could be seen in his deposition.  For example, in September 2005, he had sent a letter to the Internal Revenue Service seeking a waiver of delinquent taxes because he was "physically disabled and unable to work."  RD 54-4 at 118; RD 54-8 at 2.  Adams recognized his signature and conceded that the letter was his, but he had no idea who had typed the letter on his behalf or who had known about the delinquent taxes; he explained that the months

8

after his stroke were "a dark period in [his] life," and added, "I cannot tell you a lot about it."  RD 54-4 at 100-01, 118, 119; *see* RD 54-4 at 225 (admitting to aspects during that period which he could not remember).

Dr. Davachi nevertheless attested that when he examined Adams in August 2005, he believed Adams "was able to perform the essential functions of his position."  RD 58-6 at 3.  He based this conclusion on a "discussion with Mr. Adams concerning his job responsibilities" and "review" of Adams's position description.  RD 58-6 at 3.  Dr. Davachi added: "Although I am not an expert in computers, Mr. Adams explained to me some of his tasks, such as providing information on a help desk, training, and writing reports."  RD 58-6 at 3.

## 3.     The Department Denies Adams's Request To Work From Home.

In August 2005, Adams requested accommodation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 *et seq.*, asking to be allowed to work from home.  RD 54-4 at 128.  He supported his request with a letter from Dr. Davachi, which stated:

> Please accept this letter as a notification that Albert Adams is indefinitely unable to work in an office setting.  He has suffered from a massive stroke on his left side, and is currently physically disabled. On the other hand Mr. Adams is able to work from home.  He is still able to operate with his right hand, see the computer screen, and understand all that is required for the job.  His recovery period is unknown at this time.

RD 54-9 at 4.

9

The request was forwarded to David Prince, the Department's equal employment opportunity ("EEO") manager, who met with Adams and his wife in their home in early September 2005.  RD 56 at 109.  According to Prince, Adams "didn't do a lot of talking," instead relying on his wife to do so.  RD 56 at 100. "Because Mrs. Adams was so concerned about the issue of income, [Prince] encouraged [her] to seek an emergency determination that Mr. Adams could be considered for reasonable accommodation from his home, by working from home."  RD 56 at 101.  Adams's wife "wrote . . . to the director of the Agency and asked for a response as soon as possible from the Agency."  RD 56 at 101.

On September 13, 2005, Adams had a "final counseling interview" with Prince, where he was told that the Department "could not provide [him] with the accommodation of allowing [him] to work from home."  RD 58-4 at 4.  The following day, Adams applied for Social Security; he was awarded disability benefits the next month.  RD 58-4 at 5.

Prince continued to look into Adams's request for an accommodation.  After he obtained more information from Adams's physician (which is not in the record), he asked Adams's manager, Eric Strassman, "whether the accommodation . . . [wa]s one that could be granted."  RD 56 at 109.  But Strassman had joined the Department only a few weeks earlier, and he told Prince that he was still "looking at his organization to see what [functions] everybody was . . . performing."  RD 56

10

at 114; RD 60 at 12; *see* RD 60 at 16.  Although they met a second time, Strassman never described Adams's duties to Prince, nor did he state definitively whether Adams could perform those duties from home.  RD 56 at 116, 119-20.

In a January 2006 letter, Prince told Adams that he "felt that Mr. Adams was a qualified individual with a disability."  RD 56 at 109.  He testified that he had based this opinion on Adams's position description and Dr. Davachi's conclusion that Adams "could perform with the right side of his body and could operate a computer."  RD 56 at 116.  Prince described this as a "recommendation" to Department officials, explaining: "[I]t was not for me to say whether or not . . . Mr. Adams' function, could be performed at home.  All I could do was say, in my opinion, Mr. Adams was a qualified individual with a disability.  The ultimate decision as to whether or not he could work from home did not rest with me."  RD 56 at 120-21; *see* RD 56 at 126-27.  Because Strassman had not indicated whether Adams could have performed his essential functions from home, however, Prince did not recommend that the Department grant Adams's request to do so.  RD 56 at 133-34.

A month later, on February 6, 2006, the Department, through Prince, formally denied Adams's request to work from home.  RD 56 at 131-32.  The letter explained that the Department was "unable to grant the accommodation" because it

"d[id] not currently have a policy on telecommuting and [wa]s unaware of any District Government policy regarding the subject."  RD 57 at 2.

Adams and his wife describe two telephone conversations they had with Strassman during this time that they found unpleasant.  Adams testified that, on August 19, 2005, Strassman called him and said "that [he] needed to catch the bus or something to get to work."  RD 54-4 at 143; RD 58-3 at 3; RD 58-5 at 3; *see* RD 11-1 at 2.  Adams found this "somewhat" unkind, but admitted that he and Strassman had not yet met and Strassman may not have known that he could not take public transportation.  RD 54-4 at 220.  Adams admitted that the comment upset him because "in that condition . . . [he] was just oversensitive."  RD 54-4 at 220.  Strassman also allegedly "referr[ed] to the fact that he wasn't quite sure . . . [the Department] still needed [Adams's] position."  RD 54-4 at 229.  "At the time," Adams "considered [the statement] a little disturbing."  RD 54-4 at 230.  "I felt intimidated by Mr. Strassman due to the fact that I wasn't quite sure whether or not I was able to come back to work."  RD 54-04 at 230.

According to Adams's wife, when Strassman spoke to her on the telephone in January 2006 he was "extremely abusive" and "began shouting."  RD 58-5 at 3.  "He said that my husband was not working, but was receiving a paycheck.  I informed him that my husband was not receiving a paycheck.  Mr. Strassman continued to yell, but finally spoke to my husband."  RD 58-5 at 3.

12

**4.     In An Effort To Settle Adams's Administrative Claims, The Department Tries To Create A Job That Adams Can Perform From Home.**

On March 27, 2006, Adams filed a complaint with the District's Office of Human Rights ("OHR"), claiming that the Department had violated the District of Columbia Human Rights Act ("HRA"), D.C. Code § 2-1401.01, by failing to accommodate his disability.  RD 11-1; RD 56 at 138.  As part of the parties' attempt to mediate the dispute, Dr. Davachi conducted tests to determine what tasks Adams could perform.  RD 57-2 at 2-3; RD 58-6 at 4-5.  He reported that Adams "ha[d] greatly improved since the stroke," and again concluded that Adams was "capable to work from home."  RD 57-2 at 2-3.  He identified only two relevant limitations: inability to work in an office setting and inability to work "in a sedentary environment."[3]  RD 57-3 at 2; *see* RD 58-6 at 4, 5.

The parties entered into a non-binding "Statement of Understanding" on October 25, 2006, under which the Department would create a "[r]eport writing analyst position" so that Adams could work from home.  RD 56 at 139.  The position had been Strassman's idea—he had tried to "gauge what the agency needed, in terms of effort, and what could be done in a remote work situation" and "marry those two requirements together."  RD 60 at 16-17.  He learned that Adams had been "very good at writing reports," and that someone was needed to write

---

[3]     It is not clear what Dr. Davachi meant by this, as it is inconsistent with his recommendation that Adams be permitted to work from home.

reports for the eCura platform, and he "thought that would be a great fit for somebody like Mr. Adams." RD 60 at 17-18.

Strassman arranged for a new computer to be installed in Adams's home. RD 60 at 19; *see* RD 58; RD 58-2. He funded three training programs that would help Adams prepare for the new position, and Adams attended two. RD 54-4 at 149, 153; RD 60 at 18, 19. Once Adams had completed the training, Strassman instructed the eCura manager who was to supervise Adams to begin sending him report requests. RD 60 at 20.

It is not clear why these efforts failed. Adams testified that no work was ever sent to him. RD 54-4 at 162. His password stopped working and, despite his request that it be reset, he was never again able to access the system. RD 54-4 at 198-200. Strassman testified that Adams "seemed to have dropped off the radar." RD 60 at 21. Adams did not work for the District again. RD 54-4 at 147, 163.

## 5. OHR Finds Probable Cause That The Department Violated The HRA.

On January 1, 2008, OHR completed its investigation and issued a "letter of determination" finding probable cause that the District had violated the HRA by failing to provide Adams a reasonable accommodation. RD 57-1. The letter briefly stated that Adams had "established that he was a qualified individual with a disability," meaning that he, "with reasonable accommodation, could perform the essential functions of the job." RD 57-1 at 12-13, 14. But it did not state what the

14

essential functions of Adams's job had been, nor did it discuss whether he was capable of performing those functions from home. *See* RD 57-1 at 12-14. The records on which OHR based its decision are not in the record.

OHR advised the Department that, if "conciliation" of the claim was not accomplished within 20 days, it would "process[] this case for summary determination or a hearing before an independent hearing examiner." RD 57-1 at 16 (citing 4 DCMR §§ 109, 110 (2005)). The parties failed to reach an agreement, and Adams elected to have the matter brought before an independent hearing examiner. *See* RD 12 at 9; RD 12-2. Before the hearing examiner issued a decision, however, Adams moved to "transfer" the case to the Superior Court. *See* RD 12-4 at 2. On October 20, 2009, OHR held that Adams could "withdraw" his complaint, and it ordered the case "ADMINISTRATIVELY DISMISSED WITH PREJUDICE." RD 12-4 at 2.

**6.    The District Court Dismisses Some Claims On Procedural Grounds And Grants The District's Motion For Summary Judgment Against Adams On The Remainder.**

Adams filed suit against the District in the Superior Court on December 7, 2009, and the District removed the case to the district court. RD 1-1. In his second amended complaint, Adams claimed that the Department's failure to accommodate his disability violated the Rehabilitation Act, 29 U.S.C. § 794, the

15

ADA, and the HRA, and that Strassman had created a hostile work environment because of his disability.  RD 10.

The District moved to dismiss the complaint.  RD 11.  The district court granted the motion in part, holding that Adams's failure-to-accommodate claim under the Rehabilitation Act was untimely, and that he had forfeited his right to bring suit under the HRA when he elected to pursue an administrative remedy with OHR.[4]  RD 18 at 7-14, 24-26.

After discovery, the District moved for summary judgment on Adams's remaining claims.  RD 54-1.  The district court granted the motion, holding that Adams had offered insufficient evidence that he would have been able perform several essential functions of his position, even if he had been permitted to work from home.  RD 69 at 7-17.  The court rejected Adams's argument that "the only requirements of his job were that he complete reports and man the Department's help desk . . . remotely," pointing to an "impressive array of evidence" that "the essential functions of an IT specialist included tasks that either necessitated travel or required Adams to speak to people on the phone and sit at a desk for long periods, all things he could not do competently after his stroke."  RD 69 at 10.  The

---

[4]     The district court also dismissed Adams's claims under § 791 of the Rehabilitation Act and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*.  RD 18 at 7 n.4, n.6.  Adams does not challenge these rulings.

court refused to credit testimony that conflicted with factual statements Adams had made in his Social Security application, explaining that Adams had not "offer[ed] an explanation for the discrepanc[ies]" or "given the [c]ourt . . . reason to credit his present statements over those" he had made previously.  RD 69 at 11, 14.

The court also held that Adams had offered insufficient evidence of a hostile work environment, explaining that, "in sum, Adams alleges that his boss spoke harshly to his wife on a few occasions and made him feel unwanted as an employee."  RD 69 at 6.  "These mild slights in no way approach the bar set for this type of cause of action."  RD 69 at 6.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court order granting a motion to dismiss.  *Rochon v. Gonzales*, 438 F.3d 1211, 1217 (D.C. Cir. 2006).  Under Fed. R. Civ. P. 8(a)(2), a complaint must include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While it is not necessary for a complaint to set forth "specific facts," *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

17

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

This Court also reviews an entry of summary judgment *de novo*, drawing all inferences from the evidence in favor of the non-movant. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). Summary judgment is appropriate when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).

## SUMMARY OF ARGUMENT

1. In his Social Security application, Adams attested that his job was physically active and required him to travel to various locations throughout the District, and that he could not perform those tasks because his stroke had left him nearly bedridden. He is estopped from disputing these statements, because he has not even attempted to explain why he swore to these facts when he applied for Social Security—indeed, he swears that everything he said in his application was true. Although Adams argues that these facts are consistent with his claim that he could have performed his job from home, he has not explained how, assuming his statements are true, a reasonable fact-finder could conclude that he was capable of

18

performing the essential functions of his position, even with an accommodation. For this reason alone, the District is entitled to judgment as a matter of law.

Other undisputed evidence establishes that Adams could not have performed the essential functions of his position after his stroke. Even with an accommodation, he could not have trained staff or operated the help desk. Moreover, he admits that his stroke affected his ability to think clearly, and he has offered no evidence that, at the time his accommodation was denied, he was able to analyze complex problems, develop new or enhanced approaches to information management, and keep abreast of rapidly changing technology, as his position required. Adams has therefore offered insufficient evidence that he was qualified and therefore entitled to any accommodation under the ADA or the Rehabilitation Act.

2. Adams did not suffer a hostile work environment. He claims that, over a six-month period, he and his wife had two telephone conversations with Strassman that they found unpleasant. Even making all reasonable inferences in his favor, these two conversations cannot show that the District subjected him to the type of discriminatory intimidation, ridicule, and insult necessary to rise to establish a hostile work environment.

3. Adams forfeited his right to bring an HRA claim in court by pursuing his administrative remedies with OHR. The statute requires complainants to choose

19

between an administrative or a judicial forum in which to pursue their claims.  An

employee who has filed a complaint with OHR can bring a lawsuit in court only if

OHR dismisses the complaint for "administrative convenience" or he withdraws

his complaint before OHR has decided it.   OHR did not dismiss Adams's

complaint for administrative convenience, nor did Adams withdraw it before OHR

had completed its investigation, issued a probable cause determination, and

assigned the matter to an independent hearing examiner.  His claim in the district

court is therefore barred.

## ARGUMENT

## I.     Adams Was Not Qualified For Relief Under The ADA Or Rehabilitation Act Because He Would Not Have Been Able To Perform The Essential Functions Of His Position Even If He Had Been Permitted To Work From Home.

The ADA prohibits discrimination on the basis of disability, including "not

making reasonable accommodations to the known physical or mental limitations of

an otherwise qualified . . . employee."  42 U.S.C. § 12112(b)(5)(A).  "Reasonable

accommodations" can include job restructuring, part-time or modified work

schedules, reassignment to a vacant position, and acquisition or modification of

equipment or devices.  42 U.S.C. § 12111(9).  "[I]n appropriate cases," an agency

also must "consider work at home . . . as [a] potential form[] of accommodation."

20

*Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) (interpreting comparable provision in Rehabilitation Act, 29 U.S.C. § 791).[5]

"The ADA is broad in its scope, but it only protects individuals who can perform their job." *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048-49 (8th Cir. 1999). Its "protection extends" only "to 'qualified individuals . . . with disabilities'—persons who 'with or without reasonable accommodation, can perform the essential functions of the employment position that [they] hold[] or desire[].'" *Swanks v. WMATA*, 179 F.3d 929, 584 (D.C. Cir. 1987) (quoting 42 U.S.C. § 12111(8)). An employee's "ability to . . . perform the essential functions of her job . . . is examined as of the time of the adverse employment decision at issue," *Basden v. Prof'l Transp.*, 714 F.3d 1034, 1037 (7th Cir. 2013), "even if the plaintiff is likely to recover in a relatively short period of time," *Duello v. Buchanan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972-73 (8th Cir. 2010).

Although an employer must make reasonable accommodations, the ADA "does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those

---

[5]     Decisions interpreting the Rehabilitation Act provide useful guidance in ADA cases. *See Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014) (explaining that the Rehabilitation Act "directs courts to employ the standards of the [ADA] in evaluating suits that . . . allege that an employer unlawfully denied an accommodation," and citing 29 U.S.C. § 791(g) and 29 C.F.R. § 1614.203(b)).

jobs, or hire new employees to do so." *EEOC v. LHC Grp.*, 2014 U.S. App. LEXIS

23295, *17 (5th Cir. 2014) (quoting *Burch v. City of Nacogdoches*, 174 F.3d 615,

621 (5th Cir. 1999) (refusing to require city to accommodate firefighter who could

not fight fires)). An employer therefore "need not create a new job or strip a

current job of its principal duties to accommodate a disabled employee." *Gratzl v.

Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601

F.3d 674, 680 (7th Cir. 2010); *see also Barber v. Nabors Drilling U.S.A.*, 130 F.3d

702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the

essential functions of the job with reasonable accommodation, if the only

successful accommodation is for [the employee] not to perform those essential

functions."). The employee "bears the burden of proving th[is] element[] by a

preponderance of the evidence." *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir.

2014). Thus, "[t]o avert summary judgment," an employee must "come forward

with sufficient evidence to allow a reasonable jury to conclude that . . . she was

able to perform the essential functions of her job with or without reasonable

accommodation." *Solomon*, 763 F.3d at 9.

"Essential functions" are the "fundamental job duties" of the position. 29

C.F.R. § 1630.2(n)(1). A function may be considered essential because the position

exists to perform the function, a limited number of employees are available that

can perform it, or it is highly specialized. 29 C.F.R. § 1630.2(n)(2). The ADA

states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Courts therefore "presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl*, 601 F.3d at 679.

The district court properly found that Adams offered insufficient evidence that he was "qualified" under the ADA. His Social Security application alone precludes a fact-finder from reaching this conclusion—assuming the truth of the facts he described and swore were true on two occasions, he could not possibly have been able to perform his essential functions, even if he had been permitted to work from home. Other evidence also establishes that Adams was not qualified after his stroke. He could not have trained staff or operated the help desk because he could not leave his home or communicate effectively on the telephone. And he has offered only speculation that, in light of his cognitive impairment, he had the capacity to perform the complex and creative mental tasks his job required.

23

**A.    Adams cannot claim that he could perform the essential functions of his position at the relevant time because the factual statements he made in his Social Security application conclusively establish that he could not.**

Adams is bound by the facts he swore to in his September 2005 Social Security application and then re-confirmed in a later affidavit.  RD 54-6 at 12-14; RD 58-4 at 5.  These admissions establish as a matter of law that he would not have been able to perform the essential functions of his position even if he had been permitted to work from home.

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court held that the "pursuit, and receipt, of [Social Security] does not automatically estop the recipient from pursuing an ADA claim."  *Id.* at 797.  Because the Social Security Administration "does not take the possibility of 'reasonable accommodation' into account," "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent" with a social-security application claiming that she "could not perform her own job (or other jobs) *without* it."  *Id.* at 803.  Citing *Cleveland*, as well as *Whitbeck v. Vital Signs*, 116 F.3d 588 (D.C. Cir. 1997), Adams repeatedly argues that, because he applied for Social Security *after* he was denied an accommodation, his application does not bar his claim that he was qualified under the ADA.  Br. 26-27, 39-41, 44-47, 50-54.

24

But neither *Cleveland* nor *Whitbeck* denied that an employee's *factual* statements in a Social Security application could bar him from introducing evidence to the contrary. *See Cleveland*, 526 U.S. at 802, 806-07; *Whitbeck*, 116 F.3d at 592-93. Indeed, *Cleveland* explicitly stated that the issue it addressed— whether an employee can be "disabled" for Social Security purposes *and* "qualified" under the ADA—did not "involve directly conflicting statements about purely factual matters, such as . . . 'I can/cannot raise my arm above my head.'" 526 U.S. at 802. For those statements, the Supreme Court chose to "leave the law as [it] found it," noting that federal courts (including this Court) had "held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." *Id.* at 806-07 (citing cases, including *Pyramid Sec. v. IB Resolution*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)). *Cleveland* therefore "does not stand for the proposition that [litigants] should be allowed to explain why they gave false statements on their [Social Security] applications." *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005).

This Court has likewise noted that "[v]irtually every circuit has adopted a form of the so-called 'sham affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting

party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007). In *Pyramid*—one of the decisions cited in *Cleveland*—this Court held that an investor's racketeering claims against a bank were time-barred because he could not disavow factual claims he had made in an earlier lawsuit against the bank's subsidiary. 924 F.2d at 1123-24. Although "[c]ontradictory pleadings do not usually create a judicial estoppel unless the party prevailed on the repudiated pleading," the investor had "backed up [his company's] pleading with his own affidavit," providing a specific date on which he had learned of the misconduct. *Id.* at 1123. It did not matter that, "[i]n retrospect, [he] wonder[ed] whether he had sufficient knowledge of the facts to make the sworn allegation found in his affidavit." *Id.* "Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony," and "[t]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard [the later testimony]." *Id.* (citing cases). "[T]he cases resting summary judgment on sworn but repudiated party assertions reflect both a judicial insistence that parties proceed with real care in their supporting affidavits or testimony and a belief that parties' opportunism should not readily imperil summary judgment." *Id.* at 1124.

26

Since *Cleveland*, federal courts continue to hold ADA plaintiffs to the facts they swore to in their Social Security applications, even where they testified to the contrary.   In *Reed v. Petroleum Helicopters*, 218 F.3d 477 (5th Cir. 2000), a helicopter pilot's Social Security application stated that "she could not sit, stand or walk for long periods" and "was unable to drive, walk for exercise, or use public transportation because her back was so unstable that it made her 'totally unpredictable.'"   *Id.* at 479.   The Fifth Circuit affirmed summary judgment of her ADA claim, holding that she was not qualified to perform her essential functions despite her testimony that "she had 'no problem flying' or sitting for long periods of time."   *Id.* at 479-80.   In *Mitchell v. Washingtonville Central School District*, 190 F.3d 1 (2d Cir. 1999), a school custodian's Social Security application stated "that he was incapable of standing for any length of time or of walking."   *Id.* at 7. The Second Circuit affirmed summary judgment on his ADA claim, despite his testimony that "he was able to stand and walk for a substantial portion of the work day."   *Id.* at 7.   And in *Feldman v. American Memorial Life Insurance*, 196 F.3d 783 (7th Cir. 1999), an insurance saleswoman's Social Security application stated that "she could 'barely move' and could not 'work a six to eight hour day' because of pain, stiffness and fatigue."   *Id.* at 791.   The Seventh Circuit affirmed summary judgment on her ADA claim, despite her testimony that she "'was able to perform the essential functions of her job.'"   *Id.* at 791.

27

Courts have likewise refused to credit employees' testimony that their jobs were less strenuous than they claimed in their Social Security applications.  In *Detz v. Greiner Industries*, 346 F.3d 109 (3d Cir. 2003), a construction worker's Social Security application—submitted after he was laid off for unrelated reasons—stated that he had "spent eight hours a day walking," "sometimes worked between ten and fourteen hours a day," "carried rigging and duct work up to twenty-five feet," and "frequently lifted more than fifty pounds."  *Id.* at 112.  But in his age-discrimination claim, he testified that he was "qualified" for his job because he had been transferred to a light-duty position before he was laid off.  *Id.* at 112, 121.  The Third Circuit refused to consider whether he was qualified for the light-duty position, explaining that he "appear[ed] to have manipulated the facts . . . to obtain [Social Security] benefits"—"for [Social Security] purposes, he emphasized . . . the tougher of the two" positions he had held, while in his lawsuit "he focused exclusively on his 'light' responsibilities," "for which it was easier to be 'qualified.'"  *Id.* at 121 & n.3.  "He succeeded in convincing the agency to award benefits based on his first assertion, and his inability to adequately reconcile the patently inconsistent positions dooms his ability to pursue his [age-discrimination] claim."  *Id.* at 121.

The Seventh Circuit likewise rejected a police sergeant's *post hoc* description of his duties in *Butler v. Round Lake Police Department*, 585 F.3d 1020

28

(7th Cir. 2009). To qualify for a disability pension, he testified that his duties "included 'patrol,'" which might involve "chasing a suspect or wrestling with an unruly one." *Id.* at 1022. In his ADA suit, however, he testified that those duties "weren't actually . . . required of him." *Id.* at 1024. The court refused to consider this later testimony, explaining that "a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry." *Id.* at 1024. Once the employee "proved that he could not meet [his employer's] expectations in order to get his pension," he could not "turn around and say, 'But I really can!' for purposes of [his ADA] lawsuit." *Id.*

The District does not argue that Adams's receipt of Social Security, in and of itself, bars him from claiming that he was qualified under the ADA.[6] The District instead contends that, like the employees in *Reed*, *Mitchell*, *Feldman*, *Detz*, and *Butler*, Adams is bound by the *facts* he swore to in his Social Security application. There, he described his job as physically demanding, claiming that he spent seven

---

[6] *Cleveland* holds that an ADA plaintiff cannot "simply ignore" her contention "that she was too disabled to work"—"she must explain why that . . . contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job.'" 526 U.S. at 798. Adams has done this, explaining that he "only applied for disability . . . because [the Department] had not allowed him to telework," and that it was in this context that he reported his "health w[ould] no longer allow [him] to work." Br. 44-45; RD 54-6 at 13.

hours each day walking, standing, stooping, kneeling, crouching, crawling, reaching, and handling computer equipment weighing as much as 50 pounds. RD 54-6 at 13-14. And he described his disability as severe: he said that "[t]he left side of his body [wa]s paralyzed," he "[could not] stand or walk for more than 10 minutes," and he "ha[d] to lie down all the time because he bec[ame] weak." RD 54-6 at 12. These *factual* representations make it impossible to reasonably conclude that he could have performed his essential functions after his stroke, even if he had been permitted to work from home.

Adams argues that summary judgment is nevertheless inappropriate because Dr. Davachi attested that he could perform the essential functions of his position in August 2005.[7] Br. 32-34; RD 58-6 at 3. But Dr. Davachi based his opinion on Adams's own explanation of his job responsibilities, "such as providing information on a help desk, training, and writing reports," and there is no evidence that Adams told Dr. Davachi that his job required the kind of travel and manual labor he described in his Social Security application. *See* RD 58-6 at 3. Dr.

---

[7]    Adams also argues that this Court should consider Dr. Davachi's October 2006 report, because it was issued "little more than one year later." Br. 32. But Dr. Davachi noted that, by then, Adams had "greatly improved," RD 57-2 at 2, and it is well-settled that an employee's ability to perform the essential functions of his job "is examined as of the time of the adverse employment decision at issue." *Basden*, 714 F.3d 1034, 1037; *see Duello*, 628 F.3d at 972-73; *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048-49 (8th Cir. 1999).

Davachi's description of Adams's physical condition must of course be considered, because he had personal knowledge and expertise over such matters, but this is consistent with Adams's own sworn statements and therefore adds nothing to the analysis. *Compare* RD 58-6 at 2-3 *with* RD 54-4 at 106-11, 118-23; RD 54-6 at 12. Dr. Davachi only contradicted Adams's Social Security application where he discussed Adams's essential functions. *See* RD 58-6 at 3. The district court rightly refused to consider this portion of the affidavit, because Dr. Davachi had no expertise in the area and based his opinion on Adams's own description of his duties. *See* RD 58-6 at 3 (Dr. Davachi's affidavit, stating: "Although I am not an expert in computers, Mr. Adams explained to me some of his tasks.").

Adams also points to his own deposition, where he testified that his job was completely sedentary and involved only tasks that could be performed from home. Br. 30-31. But he does not explain why he described a completely different job in his Social Security application, and why he continued to attest at summary judgment that "[e]verything that [he] wrote on application is true." RD 58-4 at 5. As in the district court, Adams has not "offer[ed] an explanation for the discrepanc[ies]" in his brief or "given the [c]ourt . . . reason to credit his present statements over those" in his Social Security application. RD 69 at 11, 14. As this Court explained in *Pyramid*, "[w]here a party emphatically and wittingly swears to a fact, it bears a heavy burden—even in the summary judgment context—when it

31

seeks to jettison its sworn statement." 924 F.2d at 1123. "The upshot is that the prior sworn statement will receive controlling weight unless the shifting party can offer persuasive reasons for believing the supposed correction." *Id.* Adams never does so.

Adams argues that his application "never states that [he] could not have worked from home, had he been provided with the accommodation of telework." Br. 27, 44. But this is precisely what it says, just not in the same words. Adams told the Social Security Administration that, on a daily basis, he traveled to various locations to train people; that he spent all but one hour of each workday walking, standing, stooping, kneeling, crouching, crawling, and lifting computer equipment; and that he could perform none of these activities after his stroke. RD 54-6 at 12-14. His factual assertions made plain that he could not perform the tasks essential to his job. And where an employee's "inconsistent statement to the [Social Security Administration] has resulted in his receipt of significant benefits in the form of disability payments, . . . allowing him to retain these benefits while he now pursues a claim predicated on a complete rejection of his prior position would give him an unfair advantage." *Mathews v. Denver Newspaper Agency*, 2011 U.S. App. LEXIS 11454, 25-27 (10th Cir. 2011).

No reasonable fact-finder could conclude that an employee who performed manual labor for seven of the eight hours he worked was not actually required to

32

do so.  *See* RD 54-6 at 13-14.  No reasonable fact-finder could conclude that an employee who traveled daily to various locations to conduct training, and who spent a significant portion of his day crawling and bending and kneeling and stooping, could perform the essential functions of his position without leaving his own home or having to stand or walk for more than 10 minutes at a time and go without "[lying] down all the time."  *See* RD 54-6 at 12.  "[A] person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry."  *Opsteen v. Keller Structures*, 408 F.3d 390, 392 (7th Cir. 2005).  Once Adams "proved that he could not meet [his employer's] expectations" in order to qualify for Social Security, he could not "turn around and say, 'But I really can!' for purposes of [his ADA] lawsuit."  *Butler*, 585 F.3d at 1024.

**B.     Other undisputed evidence establishes that Adams could not perform many of his essential functions after his stroke.**

>    1.     Training staff was an essential function, and Adams conceded that he could not perform this function.

Adams's job required him to train staff on the use of computer software.  His position description described this as a "major dut[y]," RD 54-5 at 2, and Adams confirmed this in his Social Security application.  RD 54-6 at 13-14.  In his opposition to the District's motion for summary judgment, Adams admitted that he "was responsible for training agency staff on computer systems" when he was

33

hired in 2003, RD 55-1 at 12, and he testified at deposition that he had conducted "a lot" of training sessions when the Department "first implemented" the STAR/NOMAD database in 2003 or 2004, RD 54-4 at 89, 170.

Adams testified at deposition that he had conducted no training in the first four months of 2005 before his stroke, because existing employees had already been trained and the Department had established a "training center" to train new employees.  RD 54-4 at 64-67, 89-90, 170-71.  But, as discussed, Adams is bound by the statements he made in his Social Security application, where, in response to the question, "What do you do all day?," he responded that he "t[aught] classes on computer software and hardware" and "traveled to various locations to train persons on computer software and hardware."  RD 54-6 at 13-14.  He has not explained why, if he conducted no training in the four months before his stroke and believed he would not have done so in the future, this was one of only two duties he listed in his application (and the only one he described in any detail).  Nor has he explained why, if he was no longer required to "travel[] to various locations" to conduct these training sessions, he was required to walk for one hour and stand for one hour each day.  RD 54-6 at 13-14.  Because he has not explained these inconsistencies, he is "estopped from denying the truth of [the] statements made in [his] disability application."  *Talavera v. Sch. Bd. of Palm Beach Cnty.*, 129 F.3d 1214, 1220 (11th Cir. 1997).

34

Moreover, even if Adams had not had to train staff during the four months preceding his stroke, the District has established that his ability to do so was still "essential" to his position.  Training staff is listed as one of an IT specialist's "major duties," and Adams concedes that this was a function he was hired to perform.  RD 54-5 at 2; RD 55-1 at 12.  He conducted "a lot" of training when the database went online, and he explained that he did not have to conduct this training in 2005 because existing employees had already been trained and the training center could handle any new employees.  RD 54-4 at 89, 170.  But NOMAD was being phased out, and a reasonable fact-finder would have to assume that the Department would eventually introduce new software for which training must be developed and conducted.  *See* RD 54-4 at 244 (Adams's concession that information technology becomes obsolete very quickly).  As an IT specialist, it was Adams's job to train the staff on the use of new software, and no reasonable fact-finder could conclude that this need would not arise in the future.  RD 54-5 at 2.

Adams admitted that, to train employees, he had to travel to either the Department's training center or a customer's site to do so.  RD 54-4 at 125; *see* RD 54-4 at 169-70, 172-73 (agreeing that he "necessarily had to be away from the

35

office" to conduct training).[8]  He conceded could not do this after his stroke.  RD

54-4 at 125, 169-70, 172-73.

> 2.     Operating the help desk was an essential function, and Adams's slurred speech and inability to provide in-person support prevented him from performing this function.

Adams was required to provide technical support to customers who called

the help desk for assistance.  RD 54-5 at 2.  Adams conceded that, to carry out this

essential function, he had to be able to communicate effectively on the telephone.

RD 54-4 at 63-64, 124-25, 247, 252.  In his performance evaluation, he was rated

for the quality of his "interaction with customers to ensure timely and accurate

input and output."  RD 54-4 at 63.  His position description corroborated this,

stating that an IT specialist must have the "[a]bility to communicate both orally

and in writing to provide expertise and training, prepare reports, make oral

presentations, provide customer service, and present findings."  RD 54-5 at 3.

Adams has offered insufficient evidence that he would have been able to

communicate effectively over the telephone.  Because his speech was slurred for

two to three years after his stroke, "[people] hadn't been able to understand [him]."

RD 54-4 at 222; *see* RD 54-4 at 111, 116.  And while he testified that it would not

---

[8]     Adams notes that Dr. Davachi concluded, "after reviewing Mr. Adams's position description, that travel was not essential."  Br. 39; *see* Br. 40.  But Dr. Davachi "based [this] conclusion on my discussion with Mr. Adams concerning his job responsibilities, involving computer skills," and the record is silent as to what Adams told Dr. Davachi he was required to do.  RD 58-6 at 3.

have been "impossible" for him to provide customer service over the telephone, he conceded it would have been "very difficult." RD 54-4 at 253.

The only evidence suggesting otherwise is an affidavit from Dr. Davachi, executed in April 2014, stating that "[w]hen [he] examined Mr. Adams in August 2005, [he] spoke to [Adams], and was able to understand him without difficulty." RD 58-6 at 2. But Dr. Davachi did not indicate that he spoke to Adams on the telephone, on which he would lack visual clues to help him understand what Adams was saying. *See* RD 58-6 at 2. Nor did Dr. Davachi indicate that he and Adams discussed the type of technical information that Adams would have had to communicate to customers calling the help desk. *See* RD 58-6 at 2.

Adams's disability also prevented him from providing in-person technical support, as he had done at least once a week in the three years before his stroke. *See* RD 54-4 at 57, 66-67, 96-97 (identifying various locations he provided support); RD 54-4 at 104, 253 (admitting he could not travel). He argues that "traveling to these locations was not a part of [his] job—"[i]t was . . . just something that [he] did in order to help [him] be able to help a customer." RD 54-4 at 93; *see* RD 54-4 at 95 ("I did it because it helped me to help the client to understand their problem."). But his Social Security application indicates that he did more than just talk to customers—he spent several hours a day performing hands-on work on computers and related equipment, and he had not described any

37

other duty that would have involved this type of manual labor. RD 54-6 at 14 (reporting that, every day, he spent two hours stooping, kneeling, crouching, and crawling, as well as an hour handling, grabbing, or grasping computers and related equipment).

> 3.     An IT specialist was required to analyze complex problems and keep abreast of rapidly changing technology, and Adams offered insufficient evidence that he could do this after his stroke left him cognitively impaired.

Adams's job required considerable mental acuity. According to his position description, one of his "major duties" was to "[p]lan[] and implement[] difficult and complex assignments and develop[] new methods, approaches, and procedures." RD 54-5 at 2. To do this, he was expected to "[d]evelop[] and interpret[] policies and procedures governing the planning and delivery of services," "[p]rovide[] advice and guidance on a wide range and variety of complex information technology issues, policies, standards, and guidelines," and "[e]valuate[] and recommend[] adoption of new or enhanced approaches to delivering information technology services." RD 54-5 at 2. He had to be able to "solve problems, conduct analyses, prepare written evaluative technical and non-technical documents for implementing and maintaining new and existing systems," and "develop[] new methods and techniques," in "many areas of uncertainty in approach and methodology." RD 54-5 at 4.

38

Adams offered insufficient evidence that he had the cognitive ability to perform these mentally challenging duties in the months after his stroke. He reported in his Social Security application that "his cognitive abilities ha[d] been diminished due to the stroke." RD 54-6 at 12. And he admitted at deposition that he "had some cognitive impairment" at the time—he testified that his "thinking process . . . was not functional" and he was "easily confused." RD 54-4 at 110-11, 119-20, 122-23. He testified that the time in which he was seeking an accommodation was "a dark period in [his] life," adding: "I cannot tell you a lot about it." RD 54-4 at 100-01, 118, 119; *see* RD 54-4 at 225 (admitting to aspects of that period of time that he could not remember).

Adams argues that his own "perceptions about his ability to perform the essential functions of his position create a dispute of fact." Br. 29; *see* Br. 43. But when he was asked why he believed he could have performed the essential functions of his job despite the cognitive impairment he described, he responded that "had been doing it so long, [he] knew what the programs were." RD 54-4 at 123. "Those reports and the scheduling, just typical scheduling, I believe I could remember what they were and how to do them." RD 54-4 at 123-24. But he later contradicted this testimony, admitting that he needed to be re-trained to work on the very same report-writing programs he had known how to use before his stroke, explaining that the information was "new to [him] from having [his] stroke." RD

39

54-4 at 150. "[I]t was my mind getting back to understanding, . . . knowing and understanding what I was looking at." RD 54-4 at 150-51; *see* RD 54-4 at 153 (testifying that he had to "re-learn" Microsoft Access).

Moreover, Adams's job required more than simply using the programs he already knew—he had to be able to "develop[] *new* methods, approaches, and procedures" to problems that arose, to "[e]valuate[] and recommend[] adoption of new or enhanced approaches to delivering information technology services." RD 54-5 at 2 (emphasis added). NOMAD was being "phased out," the Department had started interfacing STAR with eCura (a program that Adams was only "[a] little bit" familiar with), and Adams "had no idea what the new system [to replace NOMAD] might have been." RD 54-4 at 83, 240, 242; RD 55-7 at 3. As he conceded at deposition, information technology is a rapidly changing field, and an IT specialist who cannot stay abreast of new technology will soon find himself obsolete. RD 54-4 at 244.

Dr. Davachi did not offer an opinion about Adams's cognitive ability to handle these challenges. His 2005 letter merely stated that Adams was "able . . . to understand all that is required for the job," and his 2014 affidavit added only that he had "determined" that Adams "was able to perform the essential functions of his position," based on a "discussion with Mr. Adams concerning his job responsibilities, including computer skills." RD 54-9 at 4; RD 58-6 at 3. As the

40

district court explained, these statements amount to "nothing more than generalities" and "legal conclusions on which [Dr. Davachi] is anything but authoritative." RD 69 at 16. Adams also refers to "medical notes" in the record, Br. 35-36, 46, but these are nothing more than physical therapy records, which provide no information on Adams's cognitive abilities at the time his request for an accommodation was denied.[9] *See* RD 63.

## C. Because Adams was not qualified under the ADA, the District is entitled to summary judgment on his failure-to-accommodate claim, regardless of its response to his accommodation request.

Throughout his brief, Adams points to several statements made and actions taken that, he contends, preclude the entry of summary judgment. These statements and actions were part of the "interactive process" an employer must engage in "to determine whether there is an appropriate reasonable accommodation." *See* 29 C.F.R. § 1630.2(o)(3). But "[b]ecause the interactive process is not an end in itself, it is not sufficient for [the employee] to show that [his employer] failed to engage in an interactive process" or that it made missteps in doing so. *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000). An employee who is not "qualified" for his position simply cannot establish an ADA violation for failure to accommodate, no matter what his employer said about

---

[9]     Dr. Davachi's notes are also in the record, but they are indecipherable and Adams does not appear to rely on them. *See* RD 59.

41

his qualifications, what it tried to do to accommodate his needs, or what justification it gave for denying his request. *See Majors v. GE Elec. Co.*, 714 F.3d 527, 535-36 (7th Cir. 2013) (refusing to consider failure-to-accommodate and pretext claims where employee "point[ed] to no evidence that would allow a trier of fact to determine that she was a qualified individual"); *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 448 (11th Cir. 1996) (refusing to hold employer liable for failing to investigate employee's qualification for accommodation where "investigation would have been fruitless"); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) (similar).

Once an employee "concedes that without some form of accommodation she cannot perform the essential functions of her job," courts must "ask simply whether any reasonable accommodation would have allowed [her] to perform all the essential functions of her job." *Carr*, 23 F.3d at 529. "A contrary holding would mean that an employee has an ADA cause even though there was no possible way for the employer to accommodate the employee's disability," *Moses*, 97 F.3d at 448, and the ADA "is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made," *Willis*, 108 F.3d at 285.

Because Adams cannot establish that he was qualified for ADA relief, his arguments based on events after he requested an accommodation are irrelevant.

42

*First*, Adams argues that the District cannot claim he is unqualified because this was not the reason it gave when it denied his accommodation request.  Br. 22-24, 26-28.   In *Langdon v. HHS*, 959 F.2d 1053 (D.C. Cir. 1992), this Court criticized an agency for offering an employee one justification for denying an accommodation request, then presenting a contradictory justification in the district court.  Br. 22-24.  Adams argues that the District has done the same here, denying his request to work from home because it did not have a telecommuting policy, then arguing in the district court that he would not have been able to perform his essential functions even if the accommodation had been granted.  Br. 22-24, 26-28.

This analogy fails, because the "shifting positions" criticized in *Langdon* had nothing to do with whether the employee was qualified to perform the essential functions of her position.   The employee in *Langdon* "[wa]s being whipsawed" because her agency had conceded in its administrative decision that she had "demonstrated that her commuting to work endangered her health," then argued in the district court that she had not given the agency sufficient medical evidence linking her disability with her inability to perform.  959 F.2d at 1057-58.  But the agency also separately argued that the employee had not been qualified for an accommodation in the first place, and this Court addressed that argument without criticism.  *Id.* at 1060-61.  The District is pursuing only the latter argument—that Adams was not qualified for an accommodation because he could not have

43

performed the essential functions of his position even if he had been permitted to work from home. *See* RD 54-1 at 6-14. This is not a "*post facto* justification[]" of its decision to deny Adams's request. Br. 24. The Department's original justification is simply irrelevant, because Adams was not qualified for an accommodation in the first place.

*Second*, Adams suggests that the District is bound by Prince's belief that Adams was a "qualified individual" under the ADA. Br. 28, 31, 36, 41, 42. He cites no authority for the view that a legal conclusion by an employee of the District, even an EEO officer, would bind the District and defeat summary judgment. Moreover, Prince testified that this was just his "recommendation" to Department officials, unrelated to whether Adams's job could have been performed from home.[10] RD 56 at 120-21, 126-27. Indeed, Prince apparently did not know that, to be "qualified" under the ADA, an employee must be able to perform the essential functions of his position. *See* RD 56 at 120-21 (Prince's explanation that,

---

[10]     Adams argues Prince's opinion has probative value because *Langdon* "viewed the [United States Equal Employment Opportunity Commission's] opinion as a factor." Br. 37 (citing *Langon*, 959 F.2d at 1061). As EEO manager, however, Prince was simply the manager Department officials had designated to advise them on internal disability and discrimination complaints. RD 56 at 46-47. Adams has offered no authority suggesting that a mid-level manager's opinion is entitled to the same weight as a formal determination of a government agency charged with investigating and prosecuting such claims.

despite his belief that Adams was qualified, "it was not for [him] to say whether or not . . . Mr. Adams' function, could be performed at home").

Nor did Prince base his belief on the same facts before this Court.  There is no evidence that Prince knew what Adams had said in his Social Security application, and Prince could not have known what Adams would concede in his deposition.  Moreover, Prince reached his opinion after he met with Adams and spoke to Dr. Davachi—conversations that are not in the summary judgment record. RD 56 at 99-108.  That Prince thought Adams was "qualified" under the ADA is therefore irrelevant to whether this Court should find, in its *de novo* review of the summary judgment record, that Adams was not.

*Third*, Adams argues that the district court should have given some weight to OHR's finding that Adams was "qualified" under the ADA.  Br. 38.  But, like Prince, OHR apparently did not know that Adams had stated in his Social Security application that his job required him to be physically active for all but one hour of the day, and that his stroke had left him virtually bedridden.  *See* RD 57-1 at 4 (noting that Adams had been awarded Social Security but making no mention of his application).  Nor could OHR have known that Adams would testify at deposition that his "thinking process" was "not functional," and that he had been "easily confused" after his stroke.  RD 54-4 at 110-11, 119-20, 122-23.  And the information underlying OHR's decision may well have included evidence not

45

included in the summary judgment record, such as medical information Prince obtained from Dr. Davachi. *See* RD 57-1 at 6. The district court therefore properly noted that OHR's decision amounted to nothing more than "the legal conclusion[] of one District employee," which "[did] not call into question the mountain of primary materials and sworn testimony in this case." RD 69 at 17.

*Fourth*, Adams argues that the District failed to demonstrate "undue hardship" because the Department explained to Adams that it was denying his accommodation request because it "did not have a telework policy in place." Br. 27. But the Department is not required to demonstrate undue hardship because Adams has not met *his* burden of establishing he is qualified under the ADA.[11] *See Basden*, 714 F.3d at 1039 (affirming summary judgment "despite any shortcomings in [the employer's] response to [employee's accommodation] request" because "there was no evidence permitting a conclusion that [she] was a qualified individual for ADA purposes").

---

[11]     To the extent Adams is suggesting that the District's reason for denying the accommodation was pretextual, this too is irrelevant. Unlike most employment claims, which rise and fall on an employer's "elusive 'intent' to discriminate," "whether a requested accommodation is reasonable or whether it imposes an undue hardship are questions typically proved through direct, objective evidence." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001); *see also Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (applying objective test); *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship*, 264 F.3d 999, 1006 (10th Cir. 2001) (same).

*Fifth*, Adams argues that, by attempting to create a position where he would do nothing but write reports, the Department conceded his qualification under the ADA.  Br. 31, 42.  But the fact that the Department tried in good faith to create a new position for him is irrelevant, because it was not required to do so.  Reassignment can be a reasonable accommodation, but employers "are only required to reassign employees to existing vacant positions."  *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013); *see also McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 5 (D.C. Cir. 2010) (affirming judgment as a matter of law in favor of agency because the position requested by the employee "was not vacant when [she] requested reassignment").  As the district court explained, "neither the ADA nor the Rehabilitation Act requires that an employer create a new position to accommodate a disabled employee, even if he is a qualified individual as to that new job."  RD 69 at 16.  "Had the District not even made an effort to accommodate Adams, then, he would have had no recourse; the fact that it tried and failed cannot change that, as 'an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so.'"  RD 69 at 16 (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1257 n.3 (11th Cir. 2001)); *see also Wood v. Green*, 323 F.3d 1309, 1314

47

(11th Cir. 2003) ("Prior accommodations do not make an accommodation reasonable.").[12]

## II.    Adams Did Not Suffer A Hostile Work Environment.

The district court properly entered summary judgment against Adams on his claim that he suffered a hostile work environment because of his disability. "To prevail on such a claim, a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

Adams has presented evidence that he and his wife had two telephone conversations with Strassman over a six-month period that they found unpleasant. In the first, Strassman said "that [he] needed to catch the bus or something to get to

---

[12]    Because Adams cannot succeed on the merits of his failure-to-accommodate claim under the ADA, this Court need not consider his argument that the district court wrongly dismissed his identical claim under the Rehabilitation Act. *See Solomon*, 763 F.3d at 5.

work," which Adams found "somewhat" unkind (although Adams acknowledged that he might have been "just oversensitive"). RD 54-4 at 143, 220; RD 58-4 at 3; 58-5 at 3. Strassman also told Adams he was not sure "[the Department] still needed [his] position," which he found intimidating and "a little disturbing." RD 54-4 at 229-30. In a second telephone call, Strassman allegedly was "extremely abusive" and "began shouting" at Adams's wife, stating that Adams "was not working, but was receiving a paycheck." RD 58-5 at 3. The evidence does not indicate whether Adams's wife was also abusive and shouting or otherwise provoked Strassman.

Even making all reasonable inferences in his favor, these two conversations cannot rise to the level of a hostile work environment. In *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002), the plaintiff alleged that her employer "berated her with a tirade of profanity in a telephone conversation."[13] *Id.* at 1129. This Court dismissed her hostile work environment claim for failure to state a claim, explaining that federal anti-discrimination law "is not a 'general civility code for the American Workplace,' . . . nor does it serve as a remedy for all instances of verbal or physical harassment, for it does not 'purge the workplace of vulgarity.'"

---

[13]    The employee alleged that, during the call, her supervisor had used offensive profanities, saying: "you're a fucking idiot," "you are full of shit," "can't you fucking read," "fuck the goddamn memo," "I want to know where your fucking head was at," and "I don't have to listen to your fucking bullshit." *Id.* at 1131.

49

*Id.* at 1133. "[A] single telephone call is not sufficiently severe and pervasive to constitute a hostile work environment"—"[e]ven a few isolated incidents of offensive conduct do not amount to actionable harassment." *Id.* at 1133-34; *see also Bakersville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine sexually inappropriate comments spread over seven months did not constitute sexual harassment because the supervisor never touched employee and incidents were not sufficiently severe or pervasive); *Tatum v. Hyatt Corp.*, 918 F. Supp. 5, 7 (D.D.C. 1994) (cited with approval in *Stewart*, 275 F.3d at 1134) (holding that a single incident—where plaintiff's co-worker unexpectedly wrapped his arms around plaintiff's neck and body, rubbed against her as if to simulate sex, made comments about her physical attractiveness, and placed a piece of ice in her skirt pocket—was not sufficiently extreme to create a hostile work environment).

As the Supreme Court has made clear, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. Adams has not offered evidence of such extreme mistreatment.

## III. Adams Forfeited His Right To Bring An HRA Claim In Court By Pursuing His Administrative Remedies With OHR.

The HRA "requires complainants to choose between an administrative or a judicial forum in which to pursue their claims." *Carter v. District of Columbia*,

980 A.2d 1217, 1223 (D.C. 2009).[14]  "It provides that '[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction . . . *unless* such person has filed a complaint hereunder.'"  *Id.* (quoting D.C. Code § 2-1403.16(a)).  Thus, "[t]he jurisdiction of the court and OHR are mutually exclusive in the first instance"—"where one opts to file with OHR, he or she generally may not also file a complaint in court."  *Id.* (quoting *Brown v. Capitol Hill Club*, 425 A.2d 1309, 1311 (D.C. 1981)).  There are only two exceptions to this rule.  A "complainant may bring a lawsuit in court 'as if no [OHR] complaint had been filed' if (1) OHR dismisses the complaint for 'administrative convenience' or (2) the complainant withdraws her OHR complaint before OHR has decided it."  *Id.* (citing D.C. Code § 2-1403.16(a)).

To successfully withdraw an OHR complaint, and preserve his right to bring a claim in court, a claimant must request withdrawal "prior to the completion of [OHR's] investigation and findings."  D.C. Code § 2-1403.04.  The District of Columbia Court of Appeals has authoritatively interpreted this to mean that a plaintiff must withdraw his complaint before OHR decides whether probable cause exists.  *See Anderson v. U.S. Safe Deposit Co.*, 552 A.2d 859, 863 (D.C. 1989) (affirming the dismissal of HRA claim because the employee failed to withdraw

---

[14]      This Court is "bound to follow interpretations of D.C. law by the D.C. Court of Appeals."  *Blair-Bey v. Quick*, 151 F.3d 1036, 1050 (D.C. Cir. 1998).

her complaint prior to the OHR's finding of probable cause); *Brown*, 425 A.2d at 1312 (dismissing HRA claim because the employee failed to withdraw his complaint prior to the OHR's finding of no probable cause).

Adams elected to pursue his HRA claim in OHR; he filed an administrative charge claiming that the Department had violated the HRA by failing to accommodate his disability. RD 11-1; RD 56 at 138. OHR did not "dismiss the complaint for 'administrative convenience,'" nor did Adams "withdraw[] [his] complaint before OHR ha[d] decided it." *Carter*, 980 A.2d at 1223. Instead, on January 1, 2008, OHR completed its investigation and issued a "letter of determination" finding probable cause that the District had violated the HRA. RD 57-1. It was not until conciliation failed and a hearing examiner was appointed— at least eight months later—that Adams moved to dismiss his administrative complaint. *See* RD 12-1 at 2-8 (conciliation e-mails exchanged in August 2008). OHR construed Adams's motion to "transfer" his complaint to the Superior Court as a motion to dismiss his administrative charge and ordered the case "ADMINISTRATIVELY DISMISSED WITH PREJUDICE." RD 12-4 at 2 & n.1.[15]

---

[15]     Adams does not argue that OHR erred and there is no evidence that he sought reconsideration from OHR after it dismissed his complaint. *See* Br. 57-59; RD 12 at 27-29 (opposition to motion to dismiss). Nor does he claim that OHR's

Adams argues that, in *Anderson*, the D.C. Court of Appeals "expressly stated that, had [OHR] found Probable Cause, a different conclusion could arguably have been drawn."  Br. 57.  According to him, although a finding of "no probable cause" cuts off a claimant's opportunity to withdraw his complaint, "*Anderson* expressly stated that the court might have assumed, *arguendo*, that determination of Probable Cause does not foreclose an administrative complainant from pursuing a juridical remedy."  Br. 57-58.  This misreads *Anderson*.  There, as here, the plaintiff withdrew her administrative complaint after OHR "had determined there *was* probable cause to believe that [her] employer had engaged in unlawful practices." 552 A.2d at 860 (emphasis added).  Like Adams, the plaintiff argued that her case was distinguishable from earlier precedent, where "OHR [had] found no merit in the complaint," noting that it had "reached the opposite conclusion with respect to her complaint."  *Id.* at 861.  *Anderson* acknowledged that a district court judge had previously made such a distinction, but held that this was "incorrect" because the HRA explicitly "specifies the 'completion of [OHR's] investigation and finding' as beyond the deadline for permissible voluntary withdrawals."  *Id.* at 861 (quoting D.C. Code § 1-2544(b) (1981)).  Thus, while it was "true that at the time the

dismissal constituted a dismissal for "administrative convenience" within the meaning of D.C. Code § 2-1403.16(a).  Any such argument is therefore forfeited. *See Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (arguments not made in the district court are forfeited); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (arguments not made in opening brief are forfeited).

complaint . . . was withdrawn, it was still alive at the administrative level, . . . this factor ha[d] no bearing on [her] standing to sue."[16] *Id.*

Adams also argues that *Anderson* is not applicable because, when it was decided, "OHR was not empowered to adjudicate complaints and issue remedial orders."   Br. 58.   According to him, because his case "was still before the independent hearing examiner of [OHR]," OHR had not "completed its investigation."  Br. 58-59.  But he does not develop this argument.  He cites no authority regarding the role of this "independent hearing examiner," nor does he explain how this would change the import of a probable-cause determination, which the D.C. Court of Appeals has held represents the definitive cut-off date for voluntary withdrawal.   In this circuit, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'"  *Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1166-67 (D.C. Cir. 2013).   And Adams has not

---

[16]     In a later passage, *Anderson* "assum[ed] *arguendo* . . . that an OHR determination of probable cause does not foreclose an administrative complainant from pursuing a judicial remedy," and explained that the plaintiff's HRA claim also was barred on alternative grounds.   552 A.2d at 862.   But this cannot be construed as an invitation to argue that the court did not intend its holding about preclusion of a judicial remedy to bind future litigants.   "Arguendo" means "for the sake of argument," *Black's Law Dictionary* (8th ed. 2004) at 114, indicating that what follows does not detract from the preceding statement.

explained why OHR's use of a hearing examiner after the existence of probable cause is determined should induce this Court to disregard binding precedent.

Nor, in any event, is Adams's argument supported by applicable law. *Anderson* holds, and Adams does not dispute, that the cut-off date for withdrawing a complaint is OHR's completion of its "investigation."  552 A.2d at 861.  OHR regulations devote an entire section to its "investigation," and it makes no mention of the hearing examiner.  *See* 4 DCMR § 110.  Under these provisions, an "investigator" is assigned to the case who, "upon *completion of the investigation*," submits proposed findings of fact, conclusions, and recommendations to OHR's Office of General Counsel.  4 DCMR §§ 110.2, 110.5 (emphasis added).  The General Counsel, in turn, drafts a "Letter of Determination," recommending probable cause or no probable cause to the OHR Director, who "issue[s] a final determination to the parties."  4 DCMR § 110.6.  It is only after this determination has been made that a hearing examiner is assigned.  4 DCMR § 116.

## CONCLUSION

The Court should affirm.

55

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

January 2015

56

## CERTIFICATE OF SERVICE

I certify that on January 26, 2015, electronic copies of this brief were served through the Court's ECF system, to:

Michael J. Snider, Esq.
James L. Fuchs, Esq.
600 Reisterstown Road
Seventh Floor
Baltimore, MD 21208

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,754 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON